# EXHIBIT

# A



# PROJECT FINANCE TERM LOAN AGREEMENT

**DATE: 03/28/2011**

**Box 1**

**BORROWER: (Legal Name):** Jones, McGeathy, DDS

| Box 2 | |
|---|---|
| **ADDRESS:**     5800 Wright Rd. | **CITY:**    New Orleans<br>**STATE:**   LA<br>**ZIP:**     70128 |

| Box 3 | Box 3 (con't) |
|---|---|
| **TYPE OF ORGANIZATION:**   General Partnership | **STATE OF ORGANIZATION:**          LA |

**Box 4**

### PROJECT DESCRIPTION AND STRUCTURE

**PROJECT LOAN:**  $ 600,000.00

**MONTHLY PROJECT LOAN INTEREST RATE: 1.75%**

ADDITIONAL PROVISIONS:

This Project Finance and Term Loan Agreement (this "Agreement") is a promissory note, security agreement and guaranty, all of which are to be construed together and are binding upon the parties hereto. **Borrower and any Guarantor have read and accepted all terms of this Agreement prior to signing it. This Agreement is being executed for business purposes and not for personal, family, household or agricultural purposes.** Time is of the essence in Borrower's and Guarantor's performance of their obligations hereunder and under all related instruments and documents executed and/or delivered pursuant hereto and any renewals or extensions thereof.

**CONDITIONS PRECEDENT**

1.   **Conditions Precedent to Funding of Project Loan and Permanent Loan.** The obligation of Lender to make advances under the Project Loan, and to funding the Permanent Loan, are subject to all of the conditions and requirements of this Agreement and delivery of the following required documents or other action, all of which are conditions precedent: (a) if Borrower or Guarantor is a corporation, and if requested or required by Lender, a certified resolution of Borrower's or Guarantor's Board of Directors duly authorizing the execution, delivery and performance of all of this Agreement and all other Loan Documents or, if Borrower or Guarantor is a partnership or a limited liability company, resolutions of Borrower's or Guarantor's partners, members or managers, as applicable, duly authorizing the execution, delivery and performance of all of this Agreement and all other Loan Documents; (b) UCC financing statements duly executed on Borrower's, or if applicable, Guarantor's behalf; (c) the execution and delivery of such other instruments, documents, opinions, reports, agreements or guaranties as Lender may deem necessary or appropriate to consummate or implement the transactions contemplated hereby; (d) completion or fulfillment of any conditions listed in the Additional Provisions text box above; (e) Borrower, or if applicable, Guarantor shall have taken such other action as Lender may reasonably require to perfect its security interest in the Collateral, and any real estate (if required by Lender), and shall have paid all costs and expenses incident thereto; (f) payment by Borrower to Lender of any commitment fees, administration fees, documentation fees, mortgage or deed of trust recording or filing fees, and stamp tax, intangibles tax or filing fees relating to the loan under this Agreement and the Collateral; (g) completion and fulfillment by Borrower, and if applicable, Guarantor, of all terms, provisions and conditions of the Credit Conditions and Funding Requirements issued by Lender to Borrower and/or Guarantor, as the same may be amended, revised, replaced, modified, extended, reapproved or reissued from time to time; (h) execution on the Project Closing Date by Borrower and Guarantors of the Final Disbursement, Change and Repayment Schedule; and (i) acceptance by Lender's signature to this Agreement in Box 7.

**PROJECT LOAN PROMISSORY NOTE**

2.   **Project Loan.** Subject to the terms and conditions set forth in this Agreement and the Loan Documents, Lender shall lend to Borrower up to the amount of the Project Loan for the purposes set forth in Section 4 below. Borrower and Guarantor, for value received, jointly and severally, promise

to pay the Project Loan to the order of Lender in accordance with the terms of this Agreement. **Borrower represents and covenants to Lender that, unless otherwise specifically agreed to in writing by Lender, Lender shall be the sole and only source of financing to Borrower for the Project and the Improvements, including but not limited to, any and all equipment, fixtures and furnishings provided for the Project.**

3.    **Estimated Repayment of Project Loan.**    The estimated terms for repayment of your Project Loan at Project Closing are set forth for the Repayment Option you selected in the Proposal Letter issued to you by Lender. **These repayment terms are estimates only, and may change from the date of this Project Loan until the Project Closing Date based on the actual amount of disbursements made to Borrower during the Project and changes in the interest rate set forth in the Proposal Letter, which changes will change the Permanent Loan Term, Permanent Loan Interest Rate, Permanent Loan Monthly Payment and the Advance Payment (if applicable). The final terms for your Permanent Loan will be set forth on the Final Disbursement, Change and Repayment Schedule delivered to Borrower by Lender on or before the Project Closing Date.**

4.    **Purposes of Project Loan.**  The Project Loan shall be used to finance the costs and expenses incurred by Borrower for the Improvements and in completing the Project.  Borrower agrees to use the proceeds of the Project Loan for the purposes heretofore stated and for none other.

5.    **Disbursements.**  The Project Loan shall be disbursed to or for the benefit of Borrower in such amounts, and at such times and in such names as directed by Borrower pursuant to one or more Interim Disbursement Authorizations signed by Borrower and delivered to Lender.  On or before the Project Closing Date, Borrower shall sign and deliver to Lender the Final Disbursement, Change and Repayment Schedule to authorize Lender's final disbursements of the Project Loan. No disbursements under the Project Loan, and no final disbursement on the Project Closing Date, shall be made by Lender to Borrower, or for the benefit of Borrower, until and unless directed by Borrower to Lender pursuant to an Interim Disbursement Authorization, or the Final Disbursement, Change and Repayment Schedule, signed by Borrower and delivered to Lender or by electronic mail ("email") communication utilizing a secure email channel approved by Lender.  All interim and final disbursements directed by Borrower under any of the foregoing methods are valid, authorized, approved, confirmed and accepted by Borrower.

6.    **Project Loan Interest.**  Interest shall accrue on the unpaid principal amount of the Project Loan for each day from the date of each disbursement of proceeds of the Project Loan  at the Monthly Project Loan Interest Rate until paid in full.  Notwithstanding the foregoing, the Default Rate shall be applied and shall accrue on the Project Loan upon the occurrence and continuation of any Event of Default and on any judgment obtained by Lender against Borrower or any Guarantor pursuant to this Agreement.  Interest shall be computed on the basis of a month of 30 days and a year of 360 days.

7.    **Maturity Date of Project Loan.**  The outstanding principal amount of the Project Loan, plus all accrued interest, fees and other charges permitted under this Agreement shall be due and payable in full on the Project Closing Date, and on the Project Closing Date will be merged into and repaid under the terms of the Final Disbursement, Change and Repayment Schedule for the Permanent Loan, which Final Disbursement, Change and Repayment Schedule when executed by Lender and Borrower, shall be considered merged into, become part of and subject to the terms and conditions of this Agreement, except as otherwise therein provided. If Borrower does not proceed with the Permanent Loan on the Project Closing Date, Borrower and/or Guarantor shall pay to Lender the Stipulated Sum, in addition to payment of the Project Loan Amount, plus all unpaid accrued interest, fees and other charges permitted in this Agreement immediately upon demand or request of Lender.

8.    **Conditions Precedent to Disbursements under the Project Loan.**  The obligation of Lender to advance disbursements under the Project Loan is subject to all of the conditions and requirements of this Agreement and delivery of the following required documents or other action, all of which are conditions precedent: (a) this Agreement and all Loan Documents necessary or desirable to effect the intent of this Agreement and the Loan Documents have been duly executed and delivered to Lender, and, where applicable, duly recorded; (b) Borrower has paid to Lender any required loan fee, commitment fee, origination fee, administration fee or other costs and fees incurred or required by Lender to originate the Project Loan; (c) Borrower has furnished evidence satisfactory to Lender that the Project, when completed, will comply with all applicable zoning ordinances, building codes, and other pertinent statutes, ordinances and regulations and will be ready for occupancy; (d) such proof as Lender may reasonably request that the real property owned or leased by Borrower for the Practice are free from mechanics', materialmen's, and all other liens and defects and that all charges incurred incident to the Project have been currently paid to the date of any disbursement under the Project Loan; (e) a copy of the detailed plans and specifications of the Project; and (f) a copy of the contracts between the Borrower and all Providers, in acceptable form, with any said contract to further provide that each Provider shall furnish a receipt on each disbursement, stating that the disbursement is a payment on the contract price for the services of the Provider, and that there are no unpaid claims which could ripen into liens.  Notwithstanding anything to the contrary contained in the foregoing or under any other provision of this Agreement, Lender has the discretion to approve or deny any request by Borrower for any advance under the Project Loan.

9.    **Project Improvements.**  (a) Borrower shall commence the Project within sixty (60) days following the date of this Agreement, shall thereafter diligently and continuously proceed with the Project in accordance with the plans and specifications for the Project, and shall maintain the Project and the Improvements; (b) Lender or its representatives shall have the right to enter upon the premises for the Project and to inspect the Project and all Improvements periodically during and after the Project; and (c) the Project shall be completed no later than the Project Completion Date.

10.  **Disclaimer of Bank.**  NOTWITHSTANDING ANY INSPECTION BY LENDER OF THE PROJECT, THE PREMISES OF THE PROJECT AND THE IMPROVEMENTS THEREON, LENDER ASSUMES NO RESPONSIBILITY FOR THE QUALITY, MERCHANTABILITY, WORKING ORDER, OR FITNESS FOR A PARTICULAR PURPOSE OF THE SERVICES OF ANY PROVIDER, OR THE IMPROVEMENTS, OR THE WORKMANSHIP OF THE IMPROVEMENTS, OR THE ADHERENCE TO THE PLANS AND SPECIFICATIONS FOR THE IMPROVEMENTS AND/OR THE PROJECT.

**PERMANENT LOAN PROMISSORY NOTE**

11.  **Loan.** Subject to the terms and conditions set forth herein, Lender shall loan to Borrower the amount of the Permanent Loan as finally established and determined on the Project Closing Date. Borrower, for value received, promises to pay the Permanent Loan to the order of Lender in accordance with the terms of this Agreement and the Final Disbursement, Change and Repayment Schedule executed by Borrower and Lender on the

Project Closing Date, which Final Disbursement, Change and Repayment Schedule when executed by Lender and Borrower, shall be considered merged into, become part of and subject to the terms and conditions of this Agreement, except as otherwise therein provided.

**12. Scheduled Payments.** The outstanding principal amount of the Permanent Loan, plus all unpaid accrued interest, fees and other charges permitted in this Agreement, shall be due and payable in full on the Maturity Date. Until the Maturity Date, Borrower shall make the Permanent Loan Monthly Payments to Lender on or before each Payment Date during the Permanent Loan Term. The Permanent Loan Monthly Payments due and payable by Borrower to Lender shall be applied first to unpaid accrued interest, second to the outstanding principal amount (in such order as the Lender may elect), and third to any outstanding fees, charges, and expenses permitted under this Agreement. Any Advance Payments received in advance of the Project Closing Date will be applied, in the order as Lender may elect, to the Permanent Loan Monthly Payments due or to become due under this Agreement. Borrower shall make all scheduled payments to Lender at such address as Lender may designate in writing from time to time.

**12.1. Late Charges.** If any Monthly Payment is not paid on or before the ninth (9th) day after the Payment Date, a late charge will be assessed on the account of Borrower for the Indebtedness in an amount equal to the greater of: (a) $0.15 per dollar of any late Monthly Payment; or (b) $15.00.

**12.2. Interest. Fixed Rate.** The Permanent Loan is based on a fixed rate of interest. Interest shall accrue on the unpaid Permanent Loan amount for each day from the Project Closing Date at the per annum fixed rate of interest set forth in the Final Disbursement, Change and Repayment Schedule as the Permanent Loan Interest Rate until paid in full.

    **12.2.1 Computation of Interest.** Interest on the Permanent Loan amount shall be computed on the basis of a month of 30 days and a year of 360 days, and shall be payable monthly in arrears on the Payment Date.

    **12.2.2 Default Rate of Interest.** The Default Rate of Interest may be applied, and if applied, shall accrue on any Indebtedness not paid when due, and on any judgement obtained by Lender against Borrower or Guarantor.

## UNCONDITIONAL OBLIGATION

**13. Unconditional Obligation to Pay.** Each Borrower and each Guarantor agree that its obligation to make payments to Lender on the Indebtedness under this Agreement is absolute and unconditional, under all circumstances whatsoever, and shall not be affected by any defect in the condition, design or operation of the Collateral, any lack of maintenance or service of any Collateral, or any setoff, counterclaim, defense or reduction which Borrower or Guarantor may have against Lender, or any Provider or any supplier, servicer, broker, salesperson or other third party. Lender can accept late or partial payments, as well as payments marked "paid in full" or with other restrictive endorsements, without losing any of its rights under this Agreement. Any payment of a smaller sum than due, and/or any partial payment intended as a payment in full of a disputed amount under the Indebtedness, regardless of any endorsement restriction, will not constitute an accord and satisfaction, and must be sent to: Banc of America Practice Solutions, Inc., 600 North Cleveland Avenue, Suite 300, Westerville, Ohio 43082, Attention: Customer Service Manager. Any communication with Lender concerning Borrower's dispute of any amounts due under the Indebtedness, as well as any payments of less than the full amount due and payable hereunder, must be sent to the address set forth in the preceding sentence. All other payments the Borrower makes towards the Indebtedness are to be mailed to the address set forth on the billing statement sent by Lender to Borrower for the Permanent Loan Monthly Payment.

## SECURITY AGREEMENT

**14. Security Interest.** Borrower grants Lender a security interest in the Collateral and the proceeds of the Collateral to secure payment and performance of the Indebtedness.

**15. Representations and Warranties.** Borrower and any Guarantor, when applicable, represent, warrant, covenant and agree that at all times: (a) the Collateral shall be kept at the location for the Practice, and at any other location at which Borrower maintains a Practice; (b) Borrower shall promptly notify Lender of any change in the location of the Collateral, and Borrower shall not remove the Collateral from said location without the prior written consent of Lender, except for Inventory sold in the ordinary course of business; (c) the chief executive office, principal place of business, or business domicile, and the state of organization of Borrower are as set forth in Boxes 2 and 3 above, and Borrower shall not relocate its chief executive office, principal place of business or business domicile, or change its state of organization or name without providing Lender with 30 days' prior written notice; (d) except for the security interest granted hereby, and other interests in favor of Lender, and except as otherwise consented to in writing by Lender, Borrower is the owner of the Collateral, free from any lien, security interest, encumbrance, assignment, judgment, lien, claim or charge of any kind (whether perfected or unperfected, avoidable or unavoidable) or financing statement or other filing, with respect to any Collateral, and Borrower will defend the Collateral against all claims and demands of any and all persons at any time claiming the Collateral or any interest therein; (e) except for sales of Inventory in the ordinary course of business, Borrower will not sell, exchange, lease or otherwise dispose of any interest in the Collateral without the prior written consent of Lender and shall not, without the consent of Lender, permit any lien, security interest or encumbrance to attach to the Collateral; (f) Borrower authorizes Lender to file a financing statement describing the Collateral and/or, at Lender's option from time to time, all business assets and/or all business personal property of Borrower, and, if Lender has pre-filed a financing statement with respect thereto, Borrower hereby ratifies such filing. Borrower hereby waives any right that Borrower may have to file with the applicable filing officer any financing statement, amendment, termination or other record pertaining to the Collateral and/or Lender's interest therein. Borrower will cooperate with Lender in obtaining control of any Collateral in which a security interest may be perfected by possession or control and will, at Borrower's expense, make and do all such acts and things as Lender may from time to time request for the better evidencing, perfection, protection or validation or of realization of the benefits of, its security interest. At the request of Lender, Borrower shall join with Lender in executing one or more financing statements, or amendments thereto, for the Collateral pursuant to the requirements of the UCC, in form satisfactory to Lender. A carbon, photographic or other reproduction of this Agreement or a financing statement will be sufficient as a financing statement. Borrower hereby appoints Lender or its designee, with full power of substitution, as Borrower's attorney-in-fact to execute and/or file UCC financing statements and other security documents in Borrower's name and to perform all other acts that Lender deems necessary or appropriate to perfect and protect Lender's security interest in the Collateral. Such appointment is coupled with an interest with full power of substitution, and is irrevocable.

## INSURANCES

**16.   Flood Zone Requirements.** If the loan under this Agreement is secured by real property located in a federally designated flood zone ("Flood Zone Property"), the person granting to Lender a mortgage, deed of trust or other security interest and lien in the Flood Zone Property, whether Borrower, Guarantor or other third party mortgagor, trustor, pledgor, grantor or assignor (hereinafter "Grantor"), is required to procure and maintain flood protection insurance for such amounts and for such coverages as reasonably required by Lender and/or applicable law or regulation. If Lender determines that any Flood Zone Property is not covered by flood insurance or is covered by flood insurance in an amount less than the amount required by Lender and/or applicable law or regulation, then the Lender shall in writing notify the Grantor that it must obtain flood insurance covering the Flood Zone Property, at Grantor's expense, and in an amount at least equal to the amount required by Lender or applicable law and/or regulation. If the Grantor fails to obtain any required flood insurance within 45 days after the date of written notification by Lender to Grantor of its failure and requirement to maintain said flood insurance, such failure shall constitute an event of default hereunder, and Lender shall, in addition to any other remedies available to it under this Agreement and applicable law, purchase flood insurance covering the Flood Zone Property on the Grantor's behalf, for such amounts, and for such coverages, and for such premiums as Lender may deem appropriate and/or as required by applicable law or regulation. Grantor (including any Borrower or Guarantor) shall promptly reimburse on demand Lender for all costs incurred by Lender in connection with procuring and maintaining any required flood insurance as herein provided, or Lender may alternatively add said costs to the balance of the loan hereunder, and Grantor ratifies, confirms and agrees to the increase of the balance of the loan by said costs, and to pay said increase to Lender. Notwithstanding anything to the contrary contained in the foregoing, and in supplement thereto, Lender may require Grantor to pay, in connection with the Loan hereunder, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Grantor. Grantor acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Grantor could have obtained.

**17.   Maintenance, Insurance, and Taxes.** Borrower shall maintain the Collateral in good condition, repair and working order. In the event of any loss, theft, damage or destruction of the Collateral, Borrower shall immediately notify Lender and shall either: (a) place the same in good repair, condition and working order; (b) replace the same with like Collateral in good repair, condition and working order, free and clear of all encumbrances except in favor of Lender; or (c) pay Lender the remaining Indebtedness. Borrower shall, at Borrower's expense, maintain insurance on the Collateral against fire, theft, and such other hazards and in such form and amount as Lender may require. The amount of such insurance shall be not less than the greater of (a) the fair market value of the Collateral, or (b) the aggregate amount of outstanding Indebtedness. Lender shall be named, in a manner satisfactory to Lender, as an additional insured and/or as loss payee on all policies of insurance required hereunder. The proceeds of such insurance shall be applied toward the replacement or repair of the Collateral or to reduce or payoff the then remaining balance of the Loan hereunder. Borrower hereby appoints Lender as Borrower's attorney-in-fact to make any claim for, receive payment of, or execute or endorse all documents, checks or drafts for loss or damage or return of premium under such insurance. Each insurance policy shall provide that the insurance policy cannot be cancelled without 30 days' prior written notice to Lender. Borrower agrees to furnish to Lender proof of each insurance policy insuring the Collateral by providing to Lender a copy of the certificate of insurance or the policy itself within 10 days following the date hereof. Should Borrower fail to insure the Collateral as herein required, Lender shall have the right, but not the obligation, to purchase insurance on the Collateral in such amounts, from such insurers and for such premiums, as Lender may deem appropriate. Borrower agrees to promptly reimburse Lender for all costs incurred in connection with obtaining such insurance plus an administrative fee of $25.00 each month until Borrower provides evidence of such insurance satisfactory to Lender. Payment of such fee does not relieve Borrower from its obligation to obtain insurance. Borrower shall pay and discharge when due all taxes imposed on the Collateral. Further, Lender may discharge taxes, liens or other encumbrances at any time levied or placed on the Collateral and pay for the maintenance and preservation of the Collateral should Borrower fail to do so. Borrower agrees to promptly reimburse Lender on demand for any payment so made, and until such reimbursement, the amount so paid by Lender shall be added to the Indebtedness.

**18.   Professional Insurances.** If required by Lender as a condition for the Loan under this Agreement, and so long as there is any indebtedness, liabilities or obligations of Borrower to Lender (whether now existing or hereafter arising under the Indebtedness, this Agreement, the Loan Documents or otherwise) and without implying any limitation on this Agreement or any of the other Loan Documents, Borrower shall maintain and keep in full force and effect the following insurances issued by one or more recognized, financially sound and responsible insurance companies approved by the Lender and qualified or authorized by applicable laws to assume the risks covered by such policy, for such coverages, limits and deductibles as requested or required by Lender (unless as otherwise hereinafter specified): (a) Malpractice Insurance; (b) General Liability Insurance; (c) if required by Lender, Key-Man Life Insurance in an amount equal to or exceeding the Principal Amount, the benefits of which shall be assigned to Lender, in such form as Lender requires, as Security for the Indebtedness; (d) if required by Lender, Disability Insurance equal to the Term of this Agreement and in an amount equal to twelve (12) months of Monthly Payments, the benefits of which shall be assigned to Lender, in such form as Lender requires, as Security for the Indebtedness; (e) Property Insurance indicating full replacement value, inclusive of business income/interruption, with Lender designated as "loss payee", "assignee", or with such other similar legend; (f) Excess Liability Insurance; and (g) Workers' compensation insurance for all employees of Borrower in such amount as is required by applicable law. All insurances shall at all times be the subject of such certificates, endorsements, assignments, evidences and other requirements as Lender may direct from time to time.

## COVENANTS; FINANCIAL REPORTING

**19.   Condition Subsequent.** Borrower agrees and covenants with Lender that it will, subsequent to the closing of Borrower's Project Loan and the Permanent Loan hereunder and disbursements of proceeds under this Agreement for either or both the Project Loan and/or the Permanent Loan, complete and fulfill any uncompleted and unfulfilled provisions or conditions contained in the Credit Conditions and Funding Requirements issued by Lender to Borrower, as the same may be amended, revised, replaced, modified, reapproved or reissued from time to time, within any period prescribed by Lender.

20.  **Affirmative Covenants.**   So long as there is any indebtedness, liabilities or obligations of Borrower to Lender (whether now existing or hereafter arising under the Indebtedness, this Agreement, the Loan Documents or otherwise), Borrower will: (a) respond promptly (but in no event later than ten (10) business days after) and completely to Lender's telephone and written inquiries regarding the status of the Practice and the financial condition of Borrower; (b) do or cause to be done all things necessary to obtain, enter into, preserve and keep in full force and effect all material licenses; (c) engage in the Practice on those days and during the hours of operation established for the Practice; (d) observe the requirements (including, without limitation, requirements with respect to drugs, medications, medical waste, and "controlled substances") of all Governmental Authorities and agents of Governmental Authorities and perform the terms of all material agreements relating thereto; and (e) notify Lender immediately of any (i) notice, claim or demand from any Governmental Authorities which alleges that Borrower or any professional in the Practice is in violation of any of the terms of, or has failed to comply with, any requirement of law regulating the Practice or its operations; (ii) actual, threatened or pending (A) revocation, suspension, probation, restriction, limitation, forfeiture or refusal to renew of any professional license of Borrower, or of any licensed  professional who is an owner or shareholder, in whole or in part, of the Practice, or (B) decertification, revocation, suspension, probation, restriction, limitation, forfeiture or refusal to renew any participation or eligibility in Medicare or Medicaid and any third party payor program to the extent decertification, revocation, suspension, probation, restriction, limitation, forfeiture or refusal to renew any such other third party payor program could materially adversely affect the ability of Borrower to repay the Indebtedness;
 and (iii) other developments in the business or affairs of Borrower which could adversely affect the ability of Borrower to repay the Indebtedness or comply with the provisions of this Agreement or any of the Loan Documents.

21.  **Negative Covenants.**   So long as there is any indebtedness, liabilities or obligations of Borrower to Lender (whether now existing or hereafter arising under the Indebtedness, this Agreement, the Loan Documents or otherwise), Borrower will not allow or suffer: (a) any breach, rating reduction, restriction, suspension, probation, failure to renew, cancellation, rescission, termination, lapse or forfeiture of any material license for Borrower or for any professional who is an owner or shareholder, in whole or in part, of the Practice; (b) the dismissal, resignation or other withdrawal from the Practice of Borrower, or of any licensed  professional who is an owner or shareholder, in whole or in part, of the Practice; (c) the suspension of the operations of the Practice for more than thirty (30) days; and/or (d) the filing or threat of any lien, interest, claim or encumbrance against the Collateral and the Security, or any part thereof, including but not limited to, any real estate in which a mortgage lien or deed of trust has been granted by Borrower or Guarantor to Lender as Security.

## DEFAULT AND REMEDIES

22.  **Default Costs; Attorney Fees; Savings Clause.**   Borrower agrees to pay to the order of Lender the following costs and fees, in addition to any late fees permitted under this Agreement, when incurred:  (a) a returned check, ACH draft or payment made by Borrower to Lender for any Permanent Loan Monthly Payment equal to the greater of $50.00 or the actual bank charges to Lender at the time the check is returned for any reason, including without limitation, insufficient or uncollected funds; (b) other amounts allowed by applicable law, including without limitation, costs of foreclosure and of obtaining a judgment for money damages; and (c) reasonable fees and costs of attorneys employed by Lender for any purpose related to this Agreement or the Indebtedness, including consultation, drafting documents, sending notices or instituting, prosecuting or defending any proceedings. Such proceedings include any arbitration, collection, bankruptcy, civil action, mediation, and counterclaim in which Lender pursues or prevails or post judgment action or appeal with respect to any of the foregoing.  The fees and charges payable to Lender under this Section are in addition to such other interest, fees and charges that Lender may assess against Borrower pursuant to other provisions of this Agreement.  Notwithstanding any provision in this Agreement to the contrary, the aggregate amount of all interest, fees, penalties, expenses and other charges payable by Borrower to Lender hereunder (collectively, "Costs") shall not exceed the maximum amount permitted under applicable law, and/or, to the extent included in the determination of interest, the maximum interest rate allowable under applicable law ("Maximum Rate").  If the aggregate amount of all Costs would otherwise exceed the Maximum Rate, such amounts shall be reduced, in a manner selected by Lender in its sole and absolute discretion, to equal in the aggregate the maximum amount permitted under applicable law.  No party bound by this Agreement or any other of the Loan Documents shall have an action or remedy against Lender for any damages whatsoever or any defense to the enforcement of this Agreement any of the other Loan Documents given in connection herewith arising out of the payment or collection of any interest in excess of the Maximum Rate.

23.  **Events of Default.**   The following shall be events of default hereunder ("Events of Default"): (a) the Project and/or Improvements are abandoned or unreasonably delayed or discontinued for a period of thirty (30) calendar days (for reasons other than those beyond the control of Borrower), or any delay in the Improvements and/or Project occurs for any reason whatsoever to the extent that completion of the Project and/or Improvements cannot, in the judgment of Lender, be accomplished prior to the Project Completion Date, including but not limited to: (i) the costs, expenses and fees for the Improvements exceed the amount approved by Lender for the Project Loan; and/or (ii) the Credit Conditions and Funding Requirements for the Project Loan expire by its stated terms, without renewal by Borrower or reapproval by Lender; (b) the Borrower shall fail to construct or complete the Project and/or the Improvements strictly in accordance with the applicable plans and specifications, except as to changes or extras approved by Lender; (c) Lender receives any written notice of a lien, interest, claim or encumbrance upon the premises for the Project and Borrower fails within 30 days thereafter to resist the same in good faith by appropriate legal action or other method of causing the lien or threatened lien to be cancelled of record; (d) Borrower fails or refuses to continue with the Permanent Loan on the Project Closing Date; (e) any representation, warranty, or covenant by Borrower made to Lender in connection with this Agreement and the Project Loan and/or Permanent Loan is false or misleading in any material respect; (f) failure to make any payment of the Indebtedness and, except for a failure to pay at the Maturity Date, such failure continues for 10 days after it first becomes due; (g) Borrower or any Guarantor defaults in the performance of any of their obligations or breaches any representation, covenant, or warranty under this Agreement, under any of the other Loan Documents, or any other agreement with Lender or any affiliate of Lender; (h) the failure or refusal of Borrower or any Guarantor to provide to Lender financial statements, reports or other

information within 10 days of Lender's request for same; (i) the uninsured loss or theft or the destruction of the Collateral, or the unpermitted sale, assignment or encumbrance of or on any Collateral; (j) attachment, execution or levy on any Collateral; (k) dissolution, termination of existence, insolvency, business failure, appointment of a receiver of any part of the property of Borrower or any Guarantor, assignment for the benefit of creditors by or the commencement of any proceedings under any bankruptcy or insolvency laws by or against Borrower or any Guarantor; (l) Borrower or any Guarantor, if an individual, dies or becomes disabled; (m) Borrower or any Guarantor, without the prior written consent of Lender, stops doing business as a going concern, merges, consolidates, transfers all or substantially all of its assets to a third party or undergoes a substantial deterioration of financial condition; (n) an amendment or termination relating to a filed financing statement describing any of the Collateral or Security is improperly filed by Borrower or Guarantor; or (o) Lender deems itself insecure for any other reason or determines that there has been a material adverse change in the business, prospects, condition, affairs or operations of Borrower or any Guarantor; or (p) Lender receives notification or is otherwise made aware that Borrower or Guarantor is listed as or appears on any lists of known or suspected terrorists or terrorist organizations provided to Lender by the U.S. government under the USA Patriot Act of 2001.

**Federal law requires us to provide the following information: We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.**

24.A. **Right to Cure.** Upon the occurance of an Event of Default, Borrower and/or Guarantor shall have thirty (30) days from the date of Lender's written notice of default to Borrower and/or Guarantor ("Notice of Default") to cure the event of default(s) set forth by Lender in the Notice of Default, provided however, that nothing contained herein shall operate to waive, preclude, impede or impair Lender's ability to exercise its rights of setoff as herein provided or to assess a late fee for any required monthy payment not received by Lender on or before the ninth (9th) day from its due date.

24.B. **Remedies on Default.** Upon the occurrence of an Event of Default, Lender may at its option, exercise one or more of the following remedies without notice or demand against each Borrower and each Guarantor, except as required by law: (i) if the proceeds of the Loan hereunder are not fully disbursed, cease making additional advances under the Project Loan and/or the Permanent Loan; (ii) declare the remaining sum of all payments of principal and interest of the Indebtedness (including the Project Loan and/or the Permanent Loan, as the case may be) immediately due and payable; (iii) charge interest at the Default Rate on all Indebtedness; (iv) exercise all of Lender's rights and remedies as a secured party, including the right to enter any premises where the Collateral may be located without legal process and take possession of and remove the Collateral which, upon request of Lender, Borrower agrees to assemble and to make available at a place designated by Lender; (v) sell, lease or otherwise dispose of any Collateral or Security at public or private sale and collect any deficiency balance with or without resorting to legal process; (vi) require Borrower to assign and transfer custody of its patient medical and/or dental files, records, charts and/or lists to a duly licensed medical, dental or other health care practitioner selected by Lender in its sole discretion, to execute such documents as Lender deems necessary to effect such assignment and transfer, and to turn over and remit to Lender the proceeds from any said transfer or assignment for value; or (vii) exercise any other right or remedy available to Lender at law or in equity. Lender has no obligation to clean up or otherwise prepare the Collateral for sale. Lender has no obligation to attempt to satisfy the Indebtedness by collection from any other person liable therefore, and Lender may release, modify or waive any Collateral or Security without affecting Lender's rights against Borrower or Guarantor, each of whom waive any right he/she/it may have to require Lender to pursue any third person for any of the Indebtedness. Lender may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral or Security and compliance will not be construed to adversely affect the commercial reasonableness of any sale of the Collateral or the Security. Lender may sell the Collateral or Security without giving any warranties with respect thereto and may specifically disclaim any warranties of title or the like. This procedure will not be construed to adversely affect the commercial reasonableness of any sale of the Collateral or Security. If Lender sells any of the Collateral or Security on credit, Borrower will be credited only with payments actually made by the purchaser, received by Lender and applied to the indebtedness of the purchaser. If the purchaser fails to pay for the Collateral or Security, Lender may resell the Collateral or Security, and the Indebtedness shall be credited with the proceeds of the sale. If Lender purchases any of the Collateral or Security, Lender may pay for the Collateral or Security by crediting some or all of the Indebtedness. Lender shall have no obligation to marshal any assets in favor of Borrower or against Borrower or in payment of this Agreement, any of the Indebtedness or any other obligation owed to Lender by Borrower or any other person.

24.C. **Setoff.** (a)   In addition to any rights and remedies of the Lender provided by law, upon the occurrence and during the continuance of any event of default under this Agreement, each Borrower grants to the Lender a security interest in, and the contractual right to set off and apply, at any time, any and all Property of the Borrower held by the Lender or any of its affiliates or subsidiaries against any and all Indebtedness owing to the Lender. The set-off may be made irrespective of whether or not the Lender shall have made demand under this Agreement or any guaranty, and although such Indebtedness may be contingent or unmatured or denominated in a currency different from that of the applicable Property. (b) The set-off may be made without prior notice to the Borrower or any other party, any such notice being waived by the Borrower to the fullest extent permitted by law. The Lender agrees promptly to notify the Borrower after any such set-off and application; however, the failure to give such notice shall not affect the validity of the set-off and application. (c) For the purposes of this "Setoff" section: "Property" means any deposits (general or special, time or demand, provisional or final, individual or joint) and any instruments, securities, documents, chattel paper, credits, and any other property, rights, and interests of the Borrower that come into the possession or custody or under control of the Lender or any of its affiliates or subsidiaries. **TO THE EXTENT PERMITTED BY LAW, ANY AND ALL RIGHTS TO REQUIRE THE LENDER TO EXERCISE ITS REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL THAT SECURES THE LIABILITIES PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS, OR OTHER PROPERTY OF THE BORROWER, ARE HEREBY VOLUNTARILY, INTENTIONALLY, AND IRREVOCABLY WAIVED.**

25. **Waiver of Presentment and Notice.** Borrower and all endorsers, Guarantors, and other parties who may now or in the future be primarily or secondarily liable for payment of the Indebtedness evidenced hereby, waive presentment for payment, demand, notice of nonpayment, notice of dishonor, protest, notice of protest and all other notices in connection with the delivery, acceptance, performance, default or enforcement of this Agreement or any payment made pursuant to its terms.

26. **Joint and Several Liability.** The liability of Borrower and each Guarantor hereunder is joint and several and, upon an Event of Default

hereunder, Lender may proceed with action, judicial or otherwise, to collect the Indebtedness due from Borrower and/or each Guarantor, individually or jointly. Borrower and each Guarantor specifically agree, consent and authorize Lender to settle the whole or any part of the Indebtedness with either Borrower or any Guarantor, or all of them, without the express consent or authorization of any of them, and that Lender may proceed to collect any remaining Indebtedness after any said settlement from any party remaining liable hereunder. Lender may pursue, at its election, any nonjudicial or judicial proceedings to liquidate any Security or Collateral to satisfy the Indebtedness, and such election shall not preclude Lender from pursuing either Borrower or Guarantor for any remaining Indebtedness, or from pursuing the liquidation of any other Security or Collateral, in satisfaction of the Indebtedness.

**Notice to and Consent by Florida Borrowers and Guarantors: Garnishment: Borrower and any Guarantor consent to the issuance of a continuing writ of garnishment or attachment against Borrower's and/or any Guarantor's disposable earnings in accordance with Section 222.11, Florida Statutes in order to satisfy in whole or in part, any money judgment entered in favor of Lender.**

**GENERAL PROVISIONS**

**27. Protected Health Information. THE FOLLOWING PROVISIONS DO NOT APPLY TO VETERINARIANS OR VETERINARY PRACTICES.** A. For purposes of this Section: (i). "Agreements" shall mean this Agreement and all other documents executed by the Borrower in connection with this Agreement, the Loan Documents, the servicing and/or monitoring of the account of the Borrower for the Indebtedness, the collection of the Indebtedness, or the enforcement of the Loan Documents; (ii) "Business Associate" shall have the same meaning as the term "business associate" in 45 CFR § 160.103; (iii) "HIPAA" shall mean the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191; (iv) "Individual" shall have the same meaning as the term "individual" in 45 CFR § 160.103 and shall include a person who qualifies as a personal representative in accordance with 45 CFR § 164.502(g); (v) "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 CFR Part 160 and Part 164, Subparts A and E; (vi) "Protected Health Information" shall have the same meaning as the term "protected health information" in 45 CFR § 160.103, limited to the information created or received by Lender from or on behalf of Borrower; (vii) "Required By Law" shall have the same meaning as the term "required by law" in 45 CFR § 164.103; and (viii) "Security Rule" shall mean the Security Standards at 45 CFR Part 160 and Part 164, Subparts A and C. Any other terms used in this Section, but not otherwise defined in this Section, shall have the same meaning as those in the Privacy Rule and/or the Security Rule. A reference in this Section to a section of the Privacy Rule or the Security Rule means the section as amended from time to time. If Borrower is a "Covered Entity" under HIPAA and Lender has access to Protected Health Information under the Agreements, in the course of servicing, monitoring, or collecting the account of the Borrower for the Indebtedness, or in the course of enforcing its rights and remedies under the Agreements, the terms and conditions of this Section apply. If Borrower is not a Covered Entity, then Lender, in its sole and absolute discretion, determines whether the terms and conditions of this Section apply. The terms and conditions of this Section apply only to Protected Health Information that is outside the scope of the banking exception found in Section 1179 of the Social Security Act. B. The parties agree that Lender may receive Protected Health Information as a result of the Lender exercising its rights and/or remedies under the Agreements, or in the course of servicing the account of Borrower for the Indebtedness. Lender may use or disclose the Protected Health Information in the manner described or permitted in the Agreements, provided that such use or disclosure would not violate the Privacy Rule if done by Borrower, or as otherwise permitted under HIPAA. Lender may also use and disclose Protected Health Information for the proper management and administration of Lender or to carry out the legal responsibilities of the Lender, provided that, with respect to any disclosure, the disclosure is Required By Law or Lender obtains reasonable assurances from the person to whom the Protected Health Information is disclosed that it will remain confidential and will be used or further disclosed only as Required By Law or for the purpose for which it was disclosed to the person, and the person agrees to notify the Lender of any instances of which it is aware in which the confidentiality of the Protected Health Information has been breached. Lender may use Protected Health Information to provide Data Aggregation services to Borrower as permitted by 42 CFR § 164.504(e)(2)(i)(B). Lender may disclose Protected Health Information to Borrower's other Business Associates and may use and disclose Protected Health Information received from Borrower's other Business Associates. C. In the event that Lender does receive Protected Health Information, Lender: (i) agrees not to use or further disclose Protected Health Information other than as permitted or required in the Agreements or as Required By Law; (ii) agrees to use appropriate safeguards to prevent use or disclosure of the Protected Health Information other than as provided for in the Agreements; (iii) agrees to report to Borrower any use or disclosure of the Protected Health Information not provided for by the Agreements of which it becomes aware; (iv) agrees to ensure that any agent, including a subcontractor, to whom it provides Protected Health Information received from, or created or received by Lender on behalf of, the Borrower agrees to the same or similar restrictions and conditions that apply to the Lender in this Section; (v) agrees to provide access, at the request of the Borrower, to the Protected Health Information in a manner that allows the Borrower to comply with the requirements under 45 CFR § 164.524 and 45 CFR d 164.528; (vi) agrees to make any amendment(s) to Protected Health Information, if any, maintained in a Designated Record Set, as required by 45 CFR § 164.526; and (vii) agrees to make internal practices, books, and records relating to the use and disclosure of Protected Health Information received from, or created or received by Lender on behalf of, Borrower available to the Secretary, in a time and manner designated by the Secretary, for purposes of the Secretary determining Borrower's compliance with the Privacy Rule D. To the extent that the following may affect Lender's use or disclosure of Protected Health Information, Borrower shall: (i) notify Lender of any limitation(s) in its notice of privacy practices; (ii) notify Lender of any changes in, or revocation of, permission by Individual to use or disclose Protected Health Information; (iii) notify Lender of any restriction that Borrower has agreed to in accordance with 45 CFR § 164.522(a) prior to the Acceptance Date and shall obtain Lender's prior written approval of any such restriction requested after such date that Borrower wishes to accept; and (iv) notify Lender of any restriction that Borrower has agreed to in accordance with 45 CFR § 164.522(b). Lender reserves the right to provide Borrower with an addendum to Borrower's notice of privacy practices describing only Lender's use and disclosure of Protected Health Information. If provided to Borrower, Borrower shall incorporate the addendum into its notice of privacy practices and shall provide it as required under 45 CFR § 164.520. E. In accordance with 45 CFR § 164.314, Lender agrees to: (i) implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Borrower; (ii) ensure that any agent, including a subcontractor, to whom it provides such electronic Protected Health Information agrees to implement reasonable and appropriate safeguards to protect it; and (iii) report to Borrower any security incident of which it becomes aware. F. Borrower and Lender agree that termination

of this Section is infeasible.  Therefore, upon Borrower's knowledge of a material breach by Lender of this Section, Borrower shall notify Lender in writing of the material breach and provide an opportunity for Lender to cure the breach or end the violation.  If the material breach is not cured or ended within a reasonable period of receipt of written notice thereof, Borrower may report the violation to the Secretary.  For purposes of this subsection, sixty (60) days is deemed to be a reasonable period under all but extraordinary circumstances. If Lender determines it is not feasible for Lender to return or destroy all Protected Health Information when this Agreement terminates, the protections of this Section to such Protected Health Information shall be extended and Lender agrees that further uses and disclosures of such Protected Health Information shall be limited to those purposes specified in this Section which survive termination of the Agreements or for those purposes that make the return or destruction infeasible, for so long as Lender maintains such Protected Health Information.  G. The Parties agree to take such action as is necessary to amend this Section from time to time as is necessary:  (i) for Borrower and/or Lender to comply with the requirements of HIPAA, including but not limited to the Privacy Rule and the Security Rule; and (ii) to provide Lender with the greatest possible access to Protected Health Information in order for Lender to service the account of Borrower for the Indebtedness and to exercise all of its rights and/or remedies under this Agreement. This Section is between the parties hereto.  Nothing express or implied in this Section is intended to confer, nor shall anything herein confer, any rights, remedies, obligations, or liabilities whatsoever upon any person other than Borrower and Lender and their respective successors and assigns. The respective rights and obligations of Borrower and Lender under this Section shall survive the termination of the Agreement.

**28.  Powers and Authority.**  Each Borrower and Guarantor represents and warrants that he/she/it has the power and authority to incur the obligations hereunder and to execute, deliver and perform this Agreement, and certifies that each of their signatures hereto is genuine.  The execution and delivery by Borrower and Guarantor of this Agreement will not contravene or violate any law or any contract to which Borrower or Guarantor is a party.

**29.  Waivers.**  No delay or omission by Lender in exercising any right or remedy hereunder shall impair any right or remedy, waive or operate as an acquiescence to the Event of Default or affect any subsequent default of the same or a different nature.

**30.  Choice of Law; Jurisdiction; Venue.**  This Agreement and all matters arising out of, resulting from or in any way connected with this Agreement, the Indebtedness, the Collateral, the Security and the relationship between Borrower, Guarantor and Lender shall be governed by, interpreted under and construed in accordance with the internal laws of the State of the Borrower's principal place of business.  Lender, Borrower and Guarantor shall select and consent to be subject to the personal jurisdiction of any state or federal court located in the state of the principal place of business of Borrower so that trial shall be by and only to a court in that state.

**31.  JURY WAIVER.  BORROWER, GUARANTOR AND LENDER (BY THEIR ACCEPTANCE HEREOF) EACH HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN OR AMONG THE BORROWER, GUARANTOR AND LENDER ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, THE LOAN DOCUMENTS, OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION WITH THIS AGREEMENT OR ANY RELATIONSHIP BETWEEN BORROWER, GUARANTOR AND LENDER.  THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER'S EXTENDING THE INDEBTEDNESS AND OTHER FINANCIAL ACCOMMODATIONS TO BORROWER HEREUNDER. NOTWITHSTANDING THE FOREGOING, THE PROVISIONS OF THIS SECTION ON JURY WAIVER SHALL NOT APPLY TO BORROWER'S OR GUARANTOR'S LOCATED OR RESIDING IN THE STATE OF CALIFORNIA.**

**32.  ARBITRATION-CALIFORNIA RESIDENTS ONLY.**  Any claim or dispute ("Dispute") by Lender, Borrower and/or Guarantor, against the other, or against the employees, agents or assigns of the other, arising from or relating in any way to this Agreement or the Indebtedness (whether under a statute, in contract, tort, or otherwise and whether for money damages, penalties, declaratory judgment, equitable relief or any other remedy permitted by law or equity), including Disputes regarding the applicability of this arbitration section or validity of the entire Agreement (or any part of it), shall be resolved by binding arbitration.  The American Arbitration Association ("AAA") shall conduct the arbitration, under the appropriate AAA commercial rules and procedures in effect at the time the Dispute is filed.  The proceeding shall take place in the state of California, and in the city, county, township or other locale of the Borrower and/or Guarantor, unless some other location is chosen by mutual consent of the parties. Rules and forms of the AAA may be found at www.adr.org. If the AAA is unable or unwilling to act as arbitrator, Lender may substitute another nationally recognized, independent arbitration organization that uses a similar code of procedure. The parties shall cooperate with each other in causing the arbitration to be held in as efficient and expeditious a manner as practicable and, in this connection, to furnish such documents and make available such persons as the Arbitrator may request.  The parties have selected arbitration in order to expedite the resolution of Disputes and to reduce the costs and burdens associated with litigation.  The parties agree that the Arbitrator should take these concerns into account when determining whether to authorize discovery and, if so, the scope of permissible discovery and other hearing and pre-hearing procedures. The arbitrator shall follow existing substantive law to the extent consistent with the AAA and applicable statutes of limitation and shall honor any claims of privilege recognized by law. If any party requests, the arbitrator shall write an opinion containing the reasons for the award. The Borrower, each Guarantor and Lender agree that the Arbitrator shall have the power to award damages, injunctive relief and reasonable attorneys' fees and expenses to any party in such arbitration, subject to the limitations of Section 33 of this Agreement. Without limiting any other remedies that may be available under applicable law, the arbitrator shall have no authority to award punitive damages. Judgment upon any arbitration award may be entered in any court having jurisdiction. For the purposes of this arbitration section, Lender includes Bank of America, N.A., its parent, subsidiaries, affiliates, licensees, predecessors, successors, and assigns, and all of their offices, directors, employees, agents and assigns or any and all of them. This arbitration section does not apply to Disputes between Lender, Borrower and Guarantor previously asserted in any lawsuits filed before the date this Agreement becomes effective. However, this arbitration section applies to all Disputes now in existence or that may arise in the future. This arbitration provision shall survive the expiration or earlier termination of this Agreement. All proceedings and decisions of the arbitrator shall be maintained in confidence, to the extent legally permissible, and shall not be made public by any party or any arbitrator without the prior written consent of all parties to the arbitration, except as may be required by law. The expenses of the arbitration shall be borne by the non-prevailing party to the arbitration, including, but not limited to, the cost of experts, evidence and legal counsel. This Section on Arbitration does not apply to and does not limit the right of Lender as a result of the occurence of an event of default under this Agreement to: (i) sue or bring other legal action against

the Borrower or any Guarantor in a court of law to collect the unpaid Indebtedness; (ii) exercise self-help remedies, such as but not limited to, setoff; (iii) initiate judicial or non-judicial foreclosure against any of the Collateral; (iv) exercise any judicial or power of sale rights, or (v) act in a court of law to obtain an interim remedy, such as but not limited to, injunctive relief, writ of possession or appointment of a receiver, or additional or supplementary remedies. The filing of a court action is not intended to constitute a waiver of the right of any party, including the suing party, thereafter to require submittal of a Dispute to arbitration or judicial reference. **ALL PARTIES ACKNOWLEDGE AND AGREE THAT, EXCEPT AS PROVIDED ABOVE, THE EFFECT OF THIS ARBITRATION PROVISION IS TO PROHIBIT CLAIMS FROM BEING LITIGATED IN COURT, INCLUDING THOSE CLAIMS THAT COULD HAVE BEEN TRIED BEFORE A JURY.**

33.  **Lender's Liability; Indemnity.**  Lender shall not be liable to Borrower or any Guarantor for any indirect, consequential, punitive, or special damages of any kind or nature arising in connection with this Agreement, the Collateral, the Project, the Improvements, the Indebtedness or the Security.  Borrower hereby agrees to indemnify, defend and hold Lender, its parent and affiliates, and its and their officers, directors, employees and agents harmless from and against all loss, liability and expense, including reasonable attorney's fees and expenses, of whatever kind and nature, imposed on, incurred by or asserted against Lender that in any way relate to or arise out of this Agreement, the consummation of the transactions contemplated hereby or the Collateral, the Project and/or the Improvements, including but not limited to: (a) the selection, manufacture, purchase, acceptance or rejection of any item of Collateral or the ownership of the Collateral; (b) the delivery, lease, possession, maintenance, use, condition, return or operation of the Collateral or any of the Improvements; (c) payment of property, use, franchise or other taxes imposed on the Collateral or Improvements when payment of said taxes is demanded or requested from Lender by any taxing authority; (d) any patent or copyright infringement; (e) the conduct of Borrower or any Provider, and their respective officers, employees and agents; and (f) a breach by Borrower of any of its covenants or obligations hereunder. This provision shall survive expiration or termination of this Agreement.

34.  **Credit Reports.**  Borrower and each Guarantor authorize Lender to obtain and exchange with its affiliates and with non-Lender affiliates, credit reports or information contained therein, including consumer credit reports, in connection with this Agreement, and for periodic reviews, updates, renewals, extensions and collections.

35.  **Binding Effect; Assignment.**  This Agreement is binding upon and shall inure to the benefit of Borrower, Guarantor and Lender and each of their respective successors, heirs, personal representatives and permitted assigns, if any.  Borrower and Guarantor may not assign this Agreement. Lender may assign its rights and obligations under this Agreement at any time without the consent of Borrower or Guarantor.  Borrower and each Guarantor agree that the rights of Lender's assignee will not be subject to claims, defenses or setoffs that Borrower or any Guarantor may have against Lender.  Borrower and each Guarantor will pay Lender's assignee hereunder regardless of any claims, defenses or setoffs that Borrower or any Guarantor may have against Lender. Borrower and each Guarantor agree that Lender is not an agent of Lender's assignee and that Lender has no affiliation with such assignee except for such assignment.

36.  **Disclaimer of Warranties.**  Lender makes no warranty or representation, either express or implied, as to the value, design, condition, merchantability or fitness for a particular purpose or fitness for use of the Collateral and/or the Improvements, or any other warranty or representation, express or implied, with respect thereto.  Borrower acknowledges that Borrower independently selected and determined the suitability of the Indebtedness, the Collateral and/or the Improvements for Borrower's intended use, without being advised by Lender.  In no event shall Lender be liable for any loss or damage in connection with or arising out of this Agreement, the Collateral, the Project and/or the Improvements or the existence, furnishing, functioning or Borrower's use of any item or products or services financed by the Indebtedness under this Agreement.  No Provider, vendor, dealer, seller, distributor, consultant, supplier, broker or salesperson is an agent of Lender or its assignee with respect to the Agreement, the Indebtedness or any Collateral or any of the Improvements, as defined herein, nor are they authorized to waive or alter the terms of this Agreement, and their representations shall in no way affect Borrower's or Lender's rights and obligations as herein set forth.  Borrower has no (and hereby waives, discharges and releases all, and agrees not to assert any) defenses affirmative or otherwise, rights of setoff, rights of recoupment, claims, counterclaims, actions or causes of action of any kind or nature whatsoever against Lender, directly or indirectly, arising out of, based upon, or in any manner connected with, the Project Loan and Permanent Loan by Lender to Borrower, the Practice, the Collateral, the Improvements, and any and all related assets being purchased and/or financed by Borrower with the proceeds of either the Project Loan or the Permanent Loan, or any related transaction, event, circumstance, action, failure to act, or occurrence of any sort or type, whether known or unknown, which occurred, existed, was taken, permitted, or begun prior to the execution hereof.

37.  **Inspection.**  Borrower shall permit any authorized representatives designated by Lender, at Lender's expense, so long as Borrower is indebted to Lender or this Agreement is in effect, to visit and inspect any of the properties of Borrower, and its subsidiaries, affiliates or divisions, the Collateral therein situated,  and the books of account of Borrower, and to make copies and take extracts therefrom, and to discuss Borrower's affairs, finances and accounts with Borrower, and its officers, agents and accountants, all at such reasonable times and as often as requested.

38.  **Construction.**  The parties have participated jointly in the negotiation and drafting of this Agreement, and, in the event of any ambiguity or question of intent or interpretation, no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

39.  **Independent Review and Advice.**  Borrower and Guarantor are advised to seek independent legal, tax and financial counsel regarding this Agreement.  In the event that they decline to seek such counsel, it is intended to be a waiver thereof, and that such waiver has been freely given. Borrower and each Guarantor each warrant and represent to Lender that they have each received a complete copy of this Agreement and have read same and in so doing have obtained legal counsel or had the opportunity to consult with legal counsel in this regard.  Borrower and Guarantor each acknowledge that no one else made any promise, representation or warranty whatsoever, express or implied, concerning this Agreement and further acknowledge that they have not executed this Agreement in reliance of any such promise, representation or warranty.

40.  **No Novation.**  The parties hereto expressly agree that any existing Indebtedness of Borrower to Lender, which may be refinanced by this Agreement, shall not constitute a novation and that all rights, powers, liens, titles and estates created by virtue of past obligations, and the security interests therein given by Borrower or Guarantor to Lender, are hereby acknowledged as valid and existing liens against the Collateral and Security herein described.

**41. No Third Party Beneficiaries.** The parties intend that the benefits of this Agreement shall inure only to Borrower, Guarantor and Lender except as expressly so stated herein. Notwithstanding anything contained herein, or any conduct or course of conduct by any party hereto, before or after signing this Agreement, this Agreement shall not be construed as creating any right, claim or cause of action against Borrower, Guarantor or Lender by any other person or entity, other than Lender's assignee or holder by assignment of the Agreement.

**42. No Waivers; Cumulative Remedies.** No delay on the part of the Lender or of the owner or holder of this Agreement in exercising any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights and remedies set forth in this Agreement are cumulative and not exclusive to any rights or remedies that Lender or any subsequent owner or holder of the Agreement would otherwise have.

**43. Notices.** Any notices required or permitted to be given hereunder by any party to the other shall be in writing and shall be deemed delivered upon personal delivery; twenty-four (24) hours following transmission by facsimile with confirmation; twenty-four (24) hours following deposit with a courier for overnight delivery; or seventy-two (72) hours following deposit in the U.S. Mail, registered or certified mail, postage prepaid, return-receipt requested, addressed to the parties at the following addresses or to such other addresses as the parties may specify in writing: If to Lender: Banc of America Practice Solutions, Inc., Customer Service, 600 North Cleveland Avenue, Suite 300, Westerville, OH 43082; If to Borrower, at the name and address specified by Borrower in Boxes 1 and 2; If to Guarantor, at the name and address specified for Guarantor in Box 6 of this Agreement and/or any separate contract of guaranty, or any other addresses of Borrower and any Guarantor known or provided to Lender.

**44. Severability.** In the event any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision thereof, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

**45. Supersession and Merger; Counterparts.** This Agreement constitutes the entire agreement among the parties hereto, and supersedes all prior or contemporaneous agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof. All representations and negotiations, oral or written, concerning the subject of this Agreement are fully merged into this Agreement. Each party to this Agreement acknowledges that no representations, inducements, promises, or agreements, orally or otherwise, have been made by any other party, or by anyone acting on behalf of any party, that are not embodied herein, and that no other agreement, statement, or promise, oral or otherwise, shall be valid or binding if it is not contained in this Agreement, or in any document or writing relating to this Agreement and signed by Lender. This Agreement may be executed simultaneously or in several counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

**46. Headings.** The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

**47. Definitions.** As used in this Agreement, the capitalized terms set forth below shall have the following meanings: (a) "Acceptance Date" means the date set forth in Box 5; (b) "Advance Payment" means the payment or payments made by Borrower to Lender as set forth on the Final Disbursement, Change and Repayment Schedule as a condition to the closing of the Permanent Loan; (c) "Borrower" means the individual or individuals, or entity or entities, whose name appears in Box 1, and its successors and assigns; (d) "Collateral" means all of the business personal property and business assets of Borrower, and if applicable, any Guarantor, wherever located, and now owned or hereafter acquired, including without limitation: (i) Accounts, including health care receivables; (ii) Chattel Paper, including Electronic Chattel Paper; (iii) Goods and Inventory, including software; (iv) Equipment; (v) Instruments, including Promissory Notes; (vi) Investment Property; (vii) Documents; (viii) Deposit Accounts; (ix) Letter-of-credit rights; (x) General intangibles, including payment of intangibles, goodwill, licenses, intellectual property and tax returns; (xi) Supporting Obligations; (xii) Fixtures, including furnishings and improvements; (xiii) a Purchase Money Security Interest in any and all of the Collateral, including but not limited to, Equipment, Goods and Inventory purchased using the proceeds from loan represented by the Principal Amount; and, (xiv) to the extent not listed in the foregoing, all additions, parts, accessories, accessions, and appurtenances appertaining or attaching thereto, and all other substitutions, replacements, renewals and improvements of the any of the foregoing, and all proceeds, products, rents, issues, income, profits and avails of the foregoing, including proceeds from insurance from the loss, theft, or destruction of the Collateral. In addition, the term "Collateral" includes all Proceeds, Products and Supporting Obligations of the Collateral, including but not limited to all stock rights, subscription rights, dividends, stock dividends, stock splits, or liquidating dividends, and all cash, Accounts, Chattel Paper, Electronic Chattel Paper, Instruments, Investment Property, Promissory Notes and General Intangibles arising from the sale, rent, lease, casualty loss or other disposition of the Collateral, and any Collateral returned to, repossessed by or stopped in transit by Borrower, or if applicable, by Guarantor, and all insurance claims relating to any of the Collateral. The term "Collateral" further includes all of Borrower's, or if applicable, all of Guarantor's, right, title and interest in and to all patient lists, files and records, and books, records and data relating to the Collateral identified above, regardless of the form of media containing such information or data, and all software necessary or desirable to use any of the Collateral identified above or to access, retrieve or process any of such information or data. Where the Collateral is in the possession of the Lender or the Lender's agent, the Borrower, or if applicable, Guarantor, agrees to deliver to the Lender any property that represents an increase in the Collateral or the profits or proceeds of the Collateral. Any capitalized term in the foregoing definition not otherwise defined herein shall have the meaning given to such term in the UCC, now in effect, and as the same may be amended from time to time; (e) "Default Rate" means the lesser of (i) 5 percentage points per annum above the Monthly Project Loan Interest Rate or the Permanent Loan Interest Rate, whichever is applicable; or (ii) the maximum rate of interest permitted by applicable state law; (f) "Final Disbursement, Change and Repayment Schedule" means that document issued by Lender to Borrower on or before the Project Closing Date that will set forth the final terms for the Permanent Loan, Permanent Loan Interest Rate, Permanent Loan Term, Permanent Loan Monthly Payment and Advance Payment, as well as any other modifications or amendments to this Agreement as agreed to by Borrower and Lender; (g) "Governmental Authorities" means, collectively, any federal, state or local government, and other political subdivision thereof, and any

entity (i) "Improvements" means the construction, building, renovations, remodeling, improvements or refurbishments, and the installation of fixtures, furnishings and equipment, in and to the structure, office or space located on the real property owned or leased by Borrower for the Practice (j) "Indebtedness" means the Project Loan Amount and the Permanent Loan Amount, plus all interest, fees and expenses due or to become due Lender pursuant to the terms hereof and also any and all other indebtedness, obligations and liabilities of Borrower to Lender or any affiliate of Lender, whether now existing or hereafter arising, absolute or contingent, due or to become due, liquidated or unliquidated, direct or indirect, including all interest, fees and expenses incurred in connection therewith and any of the foregoing that arises after the filing of a petition by or against Borrower under the United States Bankruptcy Code, even if the indebtedness, liabilities and obligations are not allowed claims under the United States Bankruptcy Code; (k) "Interim Disbursement Authorization" means that document sent by Lender from time to time during the term of the Project to Borrower that, when signed by Borrower, authorizes disbursements by Lender to Providers under this Agreement; (l) "Lender" means Bank of America, N.A., and its affiliates, successors and assigns; (m) "Loan Documents" means this Agreement, any and all promissory notes, Interim Disbursement Authorizations, the Final Disbursement, Change and Repayment Schedule, and any and all other documents, instruments, guarantees, certificates, agreements, loan agreements, security agreements, guaranties, deeds of trust, mortgages, assignments or other contracts with or for the benefit of the Lender, or securing or evidencing payment of any Indebtedness of the Borrower or any Guarantor, previously, simultaneously or hereafter executed and/or delivered by the Borrower, any Guarantor and/or any other person in connection with the Project Loan Amount and the Permanent Loan, or any of the other Indebtedness, all as the same may be amended, modified, restated, substituted, extended and renewed at any time and from time to time; (n) "Maturity Date" means the date on which the final Permanent Loan Monthly Payment is due under the Permanent Loan Term; (o) "Monthly Project Loan Interest Rate" means the fixed monthly rate of interest set forth in Box 4 above; (p) "Payment Date" means the day of the month scheduled by Lender for the Permanent Loan Monthly Payment; (q) "Permanent Loan" means the sum of all disbursements made by Lender to Borrower under the Project Loan during the Project, plus unpaid interest accrued at the Monthly Project Loan Interest Rate, plus any other fees, charges and costs permitted under this Agreement or the Loan Documents, outstanding as of the Project Closing Date; (r) "Permanent Loan Interest Rate" means the per annum fixed rate of interest as set forth on the Final Disbursement, Change and Repayment Schedule that will accrue on the Permanent Loan in accordance with the terms of this Agreement; (s) "Permanent Loan Monthly Payment" means the monthly payments of principal and interest as set forth on the Final Disbursement, Change and Repayment Schedule to repay the Permanent Loan; (t) "Permanent Loan Term" means the period from the Project Closing Date through the Maturity Date as set forth on the Final Disbursement, Change and Repayment Schedule; (u) "Practice" means Borrower's professional practice or practices, now owned or hereafter acquired and wherever located, including but not limited to that professional practice established with the proceeds of the Project Loan; (v) "Project" means the planned undertaking by Borrower to construct, build, renovate, remodel, improve or refurbish the structure, office or space located on the real property owned or leased by Borrower for the Practice, and includes Improvements for the development, establishment, and operation of the Practice; (w) "Project Closing Date" means the date on which the Project Loan is closed and the Permanent Loan commences; (x) "Project Completion Date" means the date scheduled by Borrower for completion of the Project, or such other date as may be agreed to by Borrower and Lender, provided however that in no event shall the Project Completion Date be later than three hundred sixty-five (365) calendar days from the Acceptance Date; (y) "Project Loan" means the loan by Lender to Borrower for the amount set forth in Box 4 to enable Borrower to complete the Project and/or the Improvements; (z) "Proposal Letter" means that letter proposing one (1) or more options for loans by Lender to Borrower; (aa) "Provider" means any individual, person or entity providing, furnishing, supplying or delivering services, labor, material, equipment or other goods to or for the benefit of Borrower, the Project, the Improvements and/or the Practice; (bb) "Repayment Option" means that the option selected by Borrower in the Proposal Letter which estimates the terms of repayment at Project Close for the Project Loan; (cc) "Security" means all guaranties of any Indebtedness, all interests of Lender in the Collateral, any real property (if required by Lender), and all other agreements, rights, or interests insuring or guaranteeing payment of any Indebtedness or giving the Indebtedness priority over the repayment or performance of other obligations of Borrower; (dd) "Stipulated Sum" means twelve percent (12%) of the Project Loan advanced by Lender under this Agreement; and (cc) "UCC" means the Uniform Commercial Code, as adopted by and codified into the laws of the state of the principal place of business of Borrower.

**48. Financial Covenants.** Effective one (1) year after the Acceptance Date, and thereafter during the Term of this Agreement, Borrower will not permit (determined as the last day of its fiscal year) the ratio of (i) Borrower's cash basis net income plus depreciation and amortization plus interest expense for that fiscal year to (ii) Borrower's interest expense plus principal payments on long-term debt and capital leases, taxes and dividends due during that fiscal year, to be less than 1.0 to 1.0.

**PLEASE INITIAL HERE TO CONFIRM YOU HAVE READ AND UNDERSTAND THIS PROVISION OF YOUR PERMANENT LOAN.** _(Initials)_

**49. Financial Reporting Requirements.** Upon the reasonable request of Lender, Borrower and each Guarantor (when applicable) agree to furnish, or cause to be furnished, to Lender: (a) annual financial statements in a form required by Lender setting forth the financial conditions and results of operation of Borrower and Guarantor; (b) copies of Borrower's and Guarantor's federal income tax returns; (c) annual financial statements of each Borrower and Guarantor hereunder in the form required by Lender; and (d) such other financial information as Lender may from time to time reasonably request including but not limited to, profit and loss statements, income and expense statements, production statements, account receivables collections and aging reports, and personal financial statements of majority shareholders, owners, partners, or members of Borrower and any Guarantor. Borrower and Guarantor represent and warrant to Lender that any credit applications, financial statements and other financial information provided to Lender are true, complete and correct, present fairly the financial position of Borrower and Guarantor as of their respective dates, that no material adverse change has occurred to the financial position of Borrower and Guarantor since the furnishing of such information, and that Lender has relied on said financial statements and financial information in making the loan under this Agreement to Borrower.

**PLEASE INITIAL HERE TO CONFIRM YOU HAVE READ AND UNDERSTAND THIS PROVISION OF YOUR PERMANENT LOAN.** _(Initials)_

**50. Prepayments and Partial Payments.**

Borrower may not payoff this Loan in whole or in part during the first twelve (12) months from the last date the proceeds of this Loan were fully disbursed. Thereafter, Borrower may payoff this Loan by paying Lender an amount equal to the then outstanding Principal Amount, plus accrued interest computed on a simple interest basis and any other sums due Lender at the time of payoff. **Borrower is required to contact Lender's Payoff Department at 1-888-876-0112 to obtain a payoff statement for this loan.**

Additionally, after twelve (12) months from the last date the proceeds of this Loan were fully disbursed, Borrower may make payments to Lender to reduce the Principal Amount, provided however, that Borrower agrees it will not tender a payment to reduce the Principal Amount as a payoff of the entire balance of this loan, unless said payment for payoff of this Loan is submitted to Lender along with a payoff statement obtained by Borrower from Lender's Payoff Department. **Borrower is required to contact Lender's Payoff Department at 1-888-876-0112 to obtain a payoff statement for this loan.** Any payments made to reduce the Principal Amount, as permitted herein, shall not result in a change or increase in the monthly payments due under this Agreement or the interest rate charged on this Loan.

**PLEASE INITIAL HERE TO CONFIRM YOU HAVE READ AND UNDERSTAND THIS PROVISION OF YOUR PERMANENT LOAN.** _BJ /NLM_ (Initials)

51. **Internet or Facsimile Consents or Signatures.** This Agreement, and documents executed in connection with it during its Term, may be executed by any party hereto and delivered to Lender by Internet electronic signature or consent authorization, facsimile transmission. Each party hereto represents and warrants to the other that either the electronically authorized Internet signature or consent, or facsimile signature, is the true and authentic signature of that party. For purposes of executing and enforcing this Agreement, a document signed and transmitted by Internet signature or consent, facsimile machine or telecopier shall be deemed an original document and the signature of any party thereon shall be deemed an original signature. The transmitted document shall be considered to have the same binding effect as an original signature on an original document. At the request of any party, any Internet, facsimile or telecopy document shall be re-executed in original form by the parties that executed the Internet, facsimile or telecopy document. No party may raise the use of signature or consent by Internet or facsimile machine or telecopier or the fact that any signature or consent was transmitted through the use of the Internet or a facsimile or telecopier machine as a defense to the enforcement of this Agreement.

| Box 5 | Authorized Signature of Borrower(s): | |
|---|---|---|
| X _Brigette Jones_<br>Signature    (Please sign in BLUE ink) | Brigette N Jones<br>Print Name & Title | _5/1/11_<br>Date |
| X _Norman L McGeathy III_<br>Signature    (Please sign in BLUE ink) | Norman L McGeathy III<br>Print Name & Title | _5/1/11_<br>Date |

**GUARANTY**

**1. Guaranty.** To the extent applicable, all of the terms and conditions in the foregoing Sections of this Agreement apply to each Guarantor, and are incorporated into and made part of these provisions for Guaranty. Each Guarantor absolutely, unconditionally, jointly and severally guarantees the prompt payment when due of all Indebtedness. If Borrower fails to pay all or any part of any Indebtedness when due, Guarantor shall immediately pay to Lender the outstanding balance of all Indebtedness, regardless of whether or not Lender first pursues Borrower or exhausts any of its rights or remedies against Borrower, the Collateral, or other Security. If Guarantor consists of more than one individual or entity, each Guarantor shall be jointly and severally liable to Lender with respect to all guaranteed obligations, including, without limitation, the Indebtedness.

**2. Inducement to Lender.** Each Guarantor: (a) acknowledges that Lender would not have extended any credit, including credit evidenced by the Indebtedness, to Borrower but for the guaranty; (b) represents and warrants that Guarantor has given its guaranty to induce Lender to extend and to continue to extend credit to Borrower hereunder; (c) agrees that Lender may rely on the guaranty in extending future credit to Borrower; (d) represents and warrants that each Guarantor has received good and valuable consideration for the guaranty; (e) waives acceptance of the guaranty; (f) represents and warrants that Guarantor has not given the guaranty in reliance upon the existence of any Security; (g) acknowledges receipt of notice of all Indebtedness existing before the date Guarantor signs this Agreement; (h) waives notice of any increases in the Indebtedness incurred after this date; and (i) waives protest and all other notices of failure to pay the Indebtedness or to perform any agreement relating to any Indebtedness or the Security.

**3. No Reliance.** Each Guarantor: (a) warrants that he/she/it has not relied on any information about Borrower, the Security, or any other guarantor of the Indebtedness in providing its guaranty of the Indebtedness; (b) warrants that Guarantor has had ample opportunity to investigate Borrower, Borrower's affairs, the Security, and the effect that the Indebtedness will have on Borrower; and (c) agrees that Lender has no obligation to provide Guarantor any information about Borrower or the Security.

**4. Lender's Actions.** Without notice to or the consent of any Guarantor, Lender may do or refrain from doing anything affecting any Indebtedness or any Security, including, without limitation, the following: (a) granting or not granting any indulgences to anyone liable for payment of any Indebtedness or any Security; (b) failing to obtain or to perfect any Security; (c) failing to obtain an enforceable agreement to repay any Indebtedness; (d) releasing any Security or anyone or any property from liability for payment of any Indebtedness; (e) changing any agreement relating to any Indebtedness or any Security; (f) extending the time for payment of any Indebtedness; and (g) delaying in enforcing or failing to enforce any rights to payment of any Indebtedness or rights against any Security. Each Guarantor hereby waives all suretyship and other similar defenses, including, without limitation: (i) notice of any default hereunder or under any of the other Loan Documents and notice of all indulgences; (ii) notice of any increase in the amount of any portion of or all of the Indebtedness; (iii) demand for observance, performance or enforcement of any of the terms or provisions of this Agreement, or any of the other Loan Documents; (iv) all errors and omissions in connection with Lender's administration of the Indebtedness; (v) any right or claim of right to cause a marshalling of the assets of Borrower; and (vi) any act or omission of Lender which changes the scope of Guarantor's risk hereunder.

**4.A. Setoff.** (a)  In addition to any rights and remedies of the Lender provided by law, upon the occurrence and during the continuance of any event of default under this Agreement, each Guarantor grants to the Lender a security interest in, and the contractual right to set off and apply, at any time, any and all Property of the Guarantor held by the Lender or any of its affiliates or subsidiaries against any and all Indebtedness owing to the Lender. The set-off may be made irrespective of whether or not the Lender shall have made demand under this Agreement or any guaranty, and although such Indebtedness may be contingent or unmatured or denominated in a currency different from that of the applicable Property. (b) The set-off may be made without prior notice to the Guarantor or any other party, any such notice being waived by the Guarantor to the fullest extent permitted by law. The Lender agrees promptly to notify the Guarantor after any such set-off and application; however, the failure to give such notice shall not affect the validity of the set-off and application. (c) For the purposes of this "Setoff" section: "Property" means any deposits (general or special, time or demand, provisional or final, individual or joint) and any instruments, securities, documents, chattel paper, credits, and any other property, rights, and interests of the Guarantor that come into the possession or custody or under control of the Lender or any of its affiliates or subsidiaries. **TO THE EXTENT PERMITTED BY LAW, ANY AND ALL RIGHTS TO REQUIRE THE LENDER TO EXERCISE ITS REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL THAT SECURES THE LIABILITIES PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS, OR OTHER PROPERTY OF THE GUARANTOR, ARE HEREBY VOLUNTARILY, INTENTIONALLY, AND IRREVOCABLY WAIVED.**

**5. Subordination; Subrogation.**  If Guarantor shall advance any sums to Borrower or if Borrower shall hereafter become indebted to Guarantor, such sums and indebtedness shall be subordinate in payment in all respects to the Indebtedness then or thereafter due and owing to Lender under the Loan Documents until all of the Indebtedness has been indefeasibly paid in full. Nothing herein contained shall be construed to give Guarantor any right of subrogation in and to this Agreement or the other Loan Documents or all or any part of Lender's interest therein, until the Indebtedness shall have been indefeasibly paid in full.

**6. Reinstatement.** If at any time any payment, or portion thereof, made by, or for the account of, Borrower or Guarantor on account of any of the Indebtedness hereunder or under any of the Loan Documents is set aside by any court or trustee having jurisdiction as a voidable preference or fraudulent conveyance or must otherwise be restored or returned by Lender to Borrower or to Guarantor under any insolvency, bankruptcy or other federal and/or state laws or as a result of any dissolution, liquidation or reorganization of Borrower or upon, or as a result of, the appointment of any receiver, intervenor or conservator of, or trustee, or similar officer for Borrower, or any substantial part of its properties or assets, Guarantor hereby agrees that the Indebtedness hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, all as though such payments(s) had not been made.

**7. Continuing Guaranty.**  This is a continuing guaranty and may not be terminated or revoked by Guarantor unless and until all Indebtedness to Lender has been indefeasibly paid in full in cash and Lender has no commitment to provide credit to Borrower.

**8. Internet or Facsimile Consents or Signatures.** This Agreement, and documents executed in connection with it during its Term, may be executed by any party hereto and delivered to Lender by Internet electronic signature or consent authorization, facsimile transmission. Each party hereto represents and warrants to the other that either the electronically authorized Internet signature or consent, or facsimile signature, is the true and authentic signature of that party. For purposes of executing and enforcing this Agreement, a document signed and transmitted by Internet signature or consent, facsimile machine or telecopier shall be deemed an original document and the signature of any party thereon shall be deemed an original signature. The transmitted document shall be considered to have the same binding effect as an original signature on an orignal document.

At the request of any party, any Internet, facsimile or telecopy document shall be re-executed in original form by the parties that executed the Internet, facsimile or telecopy document. No party may raise the use of signature or consent by Internet or facsimile machine or telecopier or the fact that any signature or consent was transmitted through the use of the Internet or a facsimile or telecopier machine as a defense to the enforcement of this Agreement.

---

**Box 6   GUARANTOR(S)**

**INDIVIDUAL GUARANTOR(S)**

X _Brigette Jones_
Signature      (Please sign in BLUE ink)

Name:      Brigette N Jones
Address:   5800 Wright Rd.
           New Orleans, LA 70128

5/1/11
Date

X _Norman L McGeathy III_
Signature      (Please sign in BLUE ink)

Name:      Norman L McGeathy III
Address:   5800 Wright Rd
           New Orleans, LA 70128

5/1/11
Date

**SECURITY FOR INDIVIDUAL GUARANTIES:**

☐ **If this box is checked:** As further security for the payment and performance of the Indebtedness and of the duties, responsibilities and obligations of Borrower under this Agreement and of the guaranty of the Guarantor(s) whose signatures appear above, whether individuals or businesses, said Guarantor(s) grant to Lender a security interest in the Collateral (as the term "Collateral" is defined in this Agreement) of Guarantor(s) wherever located, and whether now owned or hereafter acquired.

---

**Box 7**

This Agreement is not binding and effective until fulfillment of all conditions set forth in Section 1 captioned "Conditions Precedent to Funding of Project Loan and Permanent Loan", final credit approval of Lender, and acceptance by Lender, its assignee or nominee at its Ohio office, by its signature below.

**ACCEPTANCE BY LENDER:**
Authorized Signature:

X _____  Officer  7-29-11
Sign Name and Title                    Date

R02 10                          Page 14 of 14                    Reference Number  OMBNAA001MRQ

Documents Created By: Jenn Locke

# EXHIBIT
# B



# CHANGE NOTIFICATION AND ACKNOWLEDGMENT

This Change Notification and Acknowledgment agreement ("Change Agreement") changes, amends and modifies the Project Finance and Term Loan Agreement ("Finance Agreement") between Bank of America, N.A. ("Lender") and Kids 2 Adults Dental LLC ("Borrower"). The modification(s) to the Finance Agreement are specified below, and may include, but are not limited to, the principal amount, term, frequency, advance payment, base payment, and/or asset location.

Your signature below confirms acceptance and acknowledgment of the following changes and modification(s) to the Finance Agreement:

## Modifications are made as follows:

**BORROWER: (Legal Name):**     From:  Jones, McGeathy, DDS
**BORROWER: (Legal Name):**     To:  Kids 2 Adults Dental LLC

**TYPE OF ORGANIZATION:**     From:  Sole Proprietorship
**TYPE OF ORGANIZATION:**     To:   Limited Liability Corporation

Except as modified by this Change Agreement, all other terms and conditions of the Finance Agreement, and any other documents or instruments executed in connection with it, shall remain unchanged and in full force and effect. This Change Agreement may be executed by the Borrower and delivered to Lender by facsimile transmission, and will be effective on the date received by facsimile by Lender. Borrower represents and warrants that its facsimile signature is the true and authentic signature of Borrower. Borrower waives any claim or defense that its facsimile signature is not authorized, authentic, or enforceable in any enforcement proceeding to enforce this Change Notification and Acknowledgment.

**Lender:**

Jennifer L Loche
Name

Signature                                       7-29-1,
                                                Date

**Borrower:**

Kids 2 Adults Dental LLC
Borrower Name

Norman L McGeathy III
Brigette Jones McGeathy            7/26/11
Signature                          Date

# EXHIBIT
# C

 **Bank of America**

# CHANGE NOTIFICATION AND ACKNOWLEDGMENT

This Change Notification and Acknowledgment agreement ("Change Agreement") changes, amends and modifies the Project Finance and Term Loan Agreement ("Finance Agreement") between Bank of America, N.A. ("Lender") and A World of Smiles LLC ("Borrower"). The modification(s) to the Finance Agreement are specified below, and may include, but are not limited to, the principal amount, term, frequency, advance payment, base payment and/or asset location.

Your signature below confirms acceptance and acknowledgment of the following changes and modification(s) to the Finance Agreement:

## Modifications are made as follows:

**BORROWER: (Legal Name):**   From:  Kids 2 Adults Dental LLC
**BORROWER: (Legal Name):**   To:  A World of Smiles LLC

**TYPE OF ORGANIZATION:**   From:  LLC
**TYPE OF ORGANIZATION:**   To:  LLC

Except as modified by this Change Agreement, all other terms and conditions of the Finance Agreement, and any other documents or instruments executed in connection with it, shall remain unchanged and in full force and effect.  This Change Agreement may be executed by the Borrower and delivered to Lender by facsimile transmission, and will be effective on the date received by facsimile by Lender.  Borrower represents and warrants that its facsimile signature is the true and authentic signature of Borrower. Borrower waives any claim or defense that its facsimile signature is not authorized, authentic, or enforceable in any enforcement proceeding to enforce this Change Notification and Acknowledgment.

**Lender:**                                                        **Borrower:**

Michael Belay                                          A World of Smiles LLC
_____                      _____
Name                                                         Borrower Name

M Belay          5-18-12                          Brigette June Mc Beatty     4-3-12
_____                      _____
Signature         Date                                 Signature                Date

# EXHIBIT
# D

Gary Loftin
Caddo Parish Clerk of Court
**09-1160668**
08/01/2011 10:03 AM

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Phone:(800) 331-3282 Fax: (818) 662-4141

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

CT Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

10729 BANC OF AMERIC

29274591

LOUI

File with: CADDO, LA

_Sherry Goss_
SHERRY GOSS
DEPUTY CLERK

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| KIDS 2 ADULTS DENTAL LLC | | | | |
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
| 1c. MAILING ADDRESS 5800 Wright Road | CITY New Orleans | | STATE LA | POSTAL CODE 70128 | COUNTRY USA |
| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION LLC | 1f. JURISDICTION OF ORGANIZATION LA | 1g. ORGANIZATIONAL ID #, if any 40517218K | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
| 2c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - Insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Bank of America, N.A. | | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
| 3c. MAILING ADDRESS 600 North Cleveland Ave SUITE 300 | CITY Westerville | | STATE OH | POSTAL CODE 43082 | COUNTRY USA |

4. This FINANCING STATEMENT covers the following collateral:

To secure Debtor's indebtedness to Secured Party, Debtor grants Secured Party a continuing Security Interest in and to the following, now owned or hereafter acquired, and wherever located:(i) Accounts, including health care receivables; (ii) General Intangibles; (iii) Chattel Paper, including Electronic Chattel Paper; (iii) Goods and Inventory, including software; (iv) Equipment;(v)Instruments, including Promissory Notes;(vi)Investment Property; (vii)Documents;(viii)Deposit Accounts; (ix)Letter-of-credit rights;(x)General Intangibles, including payment of Intangibles, goodwill, licenses, intellectual property and tax returns;(xi)Supporting Obligations;(xii)Fixtures, including furnishings and improvements (xiii)a Purchase Money Security Interest in any and all of the foregoing, including but not limited to, Equipment, Goods and Inventory purchased using the proceeds from loan by Secured Party to Debtor; and, (xiv)to the extent not listed in the foregoing, all additions, parts, accessories, accessions, and appurtenances appertaining or attaching thereto, and all other substitutions, replacements, renewals and improvements of the any of the foregoing, and all proceeds, products, rents, issues, income, profits and avails of the foregoing, including proceeds from insurance from the loss, theft, or destruction of any of the foregoing. In addition, all Proceeds, Products and Supporting Obligations of any of the foregoing, including but not limited to all stock rights, subscription rights, dividends, stock dividends, stock splits, or liquidating dividends, and all cash, Accounts, Chattel Paper, Instruments, Investment Property, and General Intangibles arising from the sale, rent, lease, casualty loss or other disposition of the foregoing, and any of the foregoing returned to, repossessed by or stopped in transit by Debtor, and all insurance claims relating to any of the foregoing. All of Debtor's right, title and interest in and to all systems lists, files and records, and books, records and data relating to any of the foregoing identified above, regardless of the form of media containing such information or data, and all software necessary or desirable to use any of the foregoing identified above or to access, retrieve or process any such information or data.

| 5. ALTERNATIVE DESIGNATION [if applicable] | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [optional] ADDITIONAL FEE] [optional] | | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
| 8. OPTIONAL FILER REFERENCE DATA | | | | | | |
| 29274591 | 0082275-9002 | | 00779:9202081:000653307 | | | |

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

Prepared by CT Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

Gary Loftin, Caddo Parish Clerk of Court

# 09-1289361
02/18/2016 11:52 AM

## UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Phone: (800) 331-3282 Fax: (818) 662-4141

B. E-MAIL CONTACT AT FILER (optional)
CLS-CTLS_Glendale_Customer_Service@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)   21371 - BANK OF

CT Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

52560143

LOUI

File with: Caddo, LA

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] |
|---|---|
| 09-1160668   8/1/2011  CC LA Caddo | (or recorded) in the REAL ESTATE RECORDS<br>Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☒ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:                                    AND Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record | ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c | ☐ ADD name: Complete item 7a or 7b, and item 7c | ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

8. ☐ COLLATERAL CHANGE:   Also check one of these four boxes: ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral
Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Bank of America, N.A. | | | |
| OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA: Debtor Name: A WORLD OF SMILES LLC
52560143

Prepared by CT Lien Solutions, P.O. Box 29071

# EXHIBIT
# E

## FINAL DISBURSEMENT, CHANGE AND REPAYMENT SCHEDULE

| | | |
|---|---|---|
| **DATE:** September 06, 2012 | | |
| **BORROWER: (Legal Name):** A World of Smiles LLC | | |
| **ADDRESS:** 7240 Crowder Blvd  Suite 100 | **CITY:** New Orleans  **STATE:** LA  **ZIP:** 70127 | |
| **TYPE OF ORGANIZATION:** Limited Liability Company | **STATE OF ORGANIZATION:** LA | |

| PRINCIPAL AMOUNT | INTEREST RATE | TERM | MONTHLY PAYMENT(S) | ADVANCE PAYMENT |
|---|---|---|---|---|
| $ 643,461.59 | 8.25% Fixed rate per annum | 180 Months | 04 consecutive monthly payments @ $0.00 each, followed by 08 consecutive monthly payments @ $1,875.71 each, followed by 12 consecutive monthly payments @ $3,751.42 each, followed by 12 consecutive monthly payments @ $5,627.14 each, followed by 144 consecutive monthly payments @ $7,502.85 each | $ 0.00 |

**ADDITIONAL PROVISIONS:**

Reference is made to that certain loan agreement (whether titled as "Finance Agreement", "Project Finance Agreement", "Express Agreement", "Premium Credit Line for Business Authorization and Personal Guaranty", or other agreement, instrument, document or writing evidencing a loan (one or more the "Agreement") executed between Borrower and Bank of America, NA, ("Lender") last dated July 29, 2011 to which this Final Disbursement, Change and Repayment Schedule ("Schedule") relates and is made part of The Loan Amount set forth above is the Loan under the Agreement and this Schedule. Except as otherwise specifically defined herein, all capitalized terms in this Schedule have the same meaning as ascribed in the Agreement.

**Borrower Information:** Borrower ratifies and confirms that the information on the Borrower as set forth above is true, accurate and complete in all respects as of the date of this Schedule, and that any changes set forth above amend and modify the Borrower information as set forth in the Agreement.

**Final Loan Terms:** The final and permanent terms for the Loan are set forth above, are merged into and become part of the Agreement, and supersede and replace the estimated repayment terms set forth in any proposed or commitment written or oral, provided by Lender to Borrower for the Loan. Borrower ratifies and confirms the principal amount as the amount of the Loan made by Lender pursuant to the terms and conditions of the Agreement and this Schedule.

**Late Charges.** If any Monthly Payment is not paid on or before the ninth (9th) day after the Payment Date a late charge will be assessed on the account of Borrower for the Indebtedness in an amount equal to the greater of: (a) $0.15 per dollar of any late Monthly Payment; or (b) $15.00.

**Required Insurances.** Borrower or any Guarantor will have had a period of forty-five (45) calendar days from the Acceptance Date of the Agreement to obtain and provide to Lender any insurances required as a condition to the Loan, including but not limited to, and if required by Lender, insurances for business contents and collateral protection, life, disability, liability, malpractice, property, excess liability and workers' compensation. If Borrower fails to obtain, provide, and if required, assign to Lender any of the foregoing insurances required by Lender as condition to the Loan within said forty-five (45) calendar days, or, if at any time during the Term of the Loan, Borrower fails to maintain in full force and effect any insurance required for the Loan, then in addition to any other rights and remedies available to Lender under the Agreement, Lender may increase the interest rate on the Loan by five percent (5.00%) per annum, until the required conditions for insurance are completed and fulfilled. Borrower and/or any Guarantor, as applicable, represent and warrant to Lender that they know of no facts, circumstances, or conditions that would impair, preclude or prevent obtaining, maintaining, providing, and if required, assigning to Lender, any insurance required as a condition to the Loan.

R2.10

Reference Number:OMBNAA001MRQ

Created by:

**Final Disbursement:**  Borrower agrees, authorizes and directs Lender to disburse the proceeds remaining under the Loan to those Recipients listed below or on any exhibit attached hereto.  Disbursements may be made by Lender in the form of Lender's check or bank wire transfer, as directed by Recipient.  Borrower acknowledges and agrees that the disbursements listed below, or as directed by Borrower in writing by seperate electronic mail ("email") communication utilizing a secure email channel approved by Lender, are intended to fully pay the Borrower's obligations to the Recipients listed below and to insure that Lender has a first priority perfected lien in the assets of Borrower's professional practice.  Borrower agrees that the Loan made by Lender to Borrower is unconditional and will not be affected, impaired or compromised due to the failure of any Recipient or other party to perform as agreed, or on account of any failure or defect in the design, performance, merchantability or fitness for a particular purpose or fitness for use of any goods, services or equipment purchased by Borrower with the proceeds of the Loan, or any warranty or representation, express or implied, with respect thereto.  Disbursements of the proceeds under the Loan as directed by Borrower below or by seperate email communication as heretofore provided, and all prior disbursements of the proceeds of the Loan, were or are to Borrower or for the benefit of Borrower, and are all valid, authorized, approved, confirmed, and accepted by Borrower.

| Recipients to be paid | Account Number | Amount |
|---|---|---|
| Practice Solutions – Interim Interest | | $46,058.25 |
| A World of Smiles LLC | | $35,594.00 |

This Schedule is in supplement to and not in replacement of the Agreement, and is merged into and made part of the Agreement. Except as modified by this Schedule, all other terms and conditions of the Agreement, and of any document or instrument executed in connection with it, will remain unchanged and in full force and effect. The execution of this Schedule will not constitute a waiver of, and will not preclude the exercise of any right, power or remedy granted to Lender in the Agreement or in any other document or instrument executed in connection with it.  The parties have caused this Schedule to be executed as of the last date written below.  This Schedule may be executed by the parties hereto by facsimile transmission, and will be effective when fully executed by the parties hereto and received by facsimile by Lender.  Each party represents and warrants to the other that their respective facsimile signature is their true and authentic signature. Each party waives any claim or defense that his/her/its facsimile signature is not authorized, authentic or enforceable in any enforcement proceeding to enforce this Schedule or the Agreement.

**Customer Identification Program Notice.**  Bank of America, like all financial institutions, is required by Federal law to obtain, verify, and record information that identifies each customer that opens an account. When a client opens an account, we will ask for the client's legal name, address, tax identification number and other identifying information.  We may ask for copies of business licenses or other documents evidencing the existence and good standing of the entity. For individuals, including sole proprietors, we may ask for the date of birth, and may also ask to see photo identification or other identifying documents.

**Prepayments and Partial Payments.**

Borrower may not payoff this Loan in whole during the first twelve (12) months from the last date the proceeds of this Loan were fully disbursed ("Full Disbursement Date").  Thereafter, Borrower may payoff this Loan by paying to Lender an amount equal to: (a) the then outstanding Principal Amount, plus accrued interest computed on a simple interest basis and any other sums due Lender at the time of payoff, plus (b) a prepayment premium equal to three percent (3.00%) of the original Principal Amount, if payoff occurs in year two (2) from the Full Disbursement Date; two percent (2.00%) of the original Principal Amount, if payoff occurs in year three (3) from the Full Disbursement Date; and one percent (1.00%) of the original Principal Amount, if payoff occurs in year four (4) from the Full Disbursement Date.  No prepayment premium will be assessed on a payoff of this Loan after year four (4) from the Full Disbursement Date. Borrower shall pay the prepayment premium due hereunder whether the payoff is voluntary or involuntary. **Borrower is required to contact Lender's Payoff Department at 1-888-876-0112 to obtain a payoff statement for this Loan.**

Additionally, after twelve (12) months from the last date the proceeds of this Loan were fully disbursed, Borrower may make payments to Lender to reduce the Principal Amount, **provided however,** that Borrower agrees it will not tender a payment to reduce the Principal Amount as a payoff of the entire balance of this loan, unless said payment for payoff of this Loan is submitted to Lender along with a payoff statement obtained by Borrower from Lender's Payoff Department. Borrower is required to contact Lender's Payoff Department at 1-888-876-0112 to obtain a payoff statement for this loan. Any payments made to reduce the Principal Amount, as permitted herein, shall not result in a change or increase in the monthly payments due under this Agreement or the interest rate charged on this Loan.

Borrower:  **A World of Smiles LLC**

By:  _____  Title: _____  Date: 9/7/12

Lender: **Bank of America, NA**

By:  _____  Title: _____  Date: 9.10.12

R2.10

Reference Number: OMBNAA001MRQ

# EXHIBIT
# F

**Bank of America**

## FORBEARANCE AGREEMENT

This Forbearance Agreement (the "Agreement") dated as of October 10, 2014 (the "Effective Date"), is entered into by and between A WORLD OF SMILES LLC ("Borrower"), and BANK OF AMERICA, N.A. ("Lender").

### RECITALS

A   On or about March 28, 2011, Borrower executed that certain Project Finance and Term Loan Agreement (the "Finance Agreement") pursuant to which Lender extended financing to Borrower in the maximum principal amount of Six Hundred Thousand Dollars ($600,000.00) (the "Maximum Loan").

B   On or about September 7, 2012, Borrower executed that certain Final Disbursement, Change and Repayment Schedule (the "Final Disbursement") in favor of Lender pursuant to which the Maximum Loan was increased to the principal amount of Six Hundred Forty Three Thousand Four Hundred Sixty One and 59/100 Dollars ($643,4461.59) (the "Loan"). As used herein, the term "Loan Documents" shall mean the Finance Agreement, the Final Disbursement and all other documents executed and delivered to Lender which evidence, secure, guaranty or relate to the Loan (as heretofore modified or amended). Lender remains the owner and holder of the Loan Documents.

C   Capitalized terms used herein and not otherwise defined shall have the meaning set forth in the Loan Documents.

D   On or about February 20, 2014, and through August 20, 2014, Borrower defaulted under the terms of the Loan by failing to make the required monthly payments due pursuant to the Loan Documents. ("Identified Default").

E   Borrower has requested that Bank forbear from enforcing its rights under the Loan Documents.

F   Pursuant to Borrower's request, although under no obligation to do so, Bank is willing to forbear from exercising its rights and remedies under the Loan Documents for a period of time as specified herein and on the terms and conditions set forth herein.

For purposes of this Agreement, Borrower and Guarantor are sometimes collectively referred to as the "Obligors."

Capitalized terms used herein and not otherwise defined shall have the meaning set forth in the Loan Documents.

Now, therefore, in consideration of the premises and the mutual agreements contained herein, the parties agree as follows:

## SECTION 1. DEFINITIONS

1.1     The following terms used in this Agreement shall have the meanings set forth below:

"Forbearance Default" means (a) the occurrence of any Default, or Event of Default other than the Existing Defaults; (b) the failure of Borrower to comply with any term, condition or covenant set forth in this Agreement in any material manner, (c) any representation made by Borrower under or in connection with this Agreement shall prove to be materially false as of the date when made, or (d) the filing of any petition (voluntary or involuntary) under the insolvency or bankruptcy laws of the United States or any state with respect to Borrower, its affiliates, or any of its or their subsidiaries.

"Forbearance Termination Date" means 5:00 P.M. (New York time) on October 31, 2014.

## SECTION 2. TERMS OF FORBEARANCE

2.1     Nothing in this Agreement shall be construed as a waiver of or acquiescence of any Existing Default, which shall continue in existence subject only to the Bank's agreement as set forth herein, not to enforce its remedies for a limited period of time. Except as expressly limited herein, the Bank reserves all of its rights and remedies under the Loan Documents and under applicable law with respect to such Existing Defaults.

2.2     The forbearance period shall terminate if Borrower defaults on any obligation to any creditor other than the Bank if the Bank believes that such default materially adversely affects Borrower's ability to perform its obligations to the Bank under the Loan Documents

2.3     Unless the forbearance period is sooner terminated as provided herein, the Bank agrees to forbear from exercising its rights and remedies under the Loan Documents through the Forbearance Termination Date on the following terms and conditions hereinafter set forth. Unless specifically modified herein, all terms, conditions and covenants contained in the Loan Documents shall be and remain in full force and effect.

2.4     Upon the Forbearance Termination Date, for any reason, the Bank shall have the full right and power immediately and unconditionally to exercise all rights and remedies granted to it under the Loan Documents without further notice to Borrower and subject to no other conditions precedent.

2.5     Borrower acknowledges that the Bank's obligations under this Agreement are in the nature of a conditional forbearance only, and that the Bank has made no agreement or commitment to extend the Loan or to modify the Loan Documents.

## SECTION 3. REPRESENTATIONS AND WARRANTIES

In consideration of the Bank's promise to forbear herein contained, Borrower and each Obligor hereby represents and warrants to the Bank as of the date hereof:

3.1     **Debt.**  As of the close of business on September 30, 2014 there is due and owing the following (collectively referred to as the "Debt"):

The amount due under the Loan Documents is Six Hundred Ninety Four Thousand Nine Hundred Ninety Five and 28/100 Dollars ($694,995.28) (the "Total Indebtedness") consisting of principal in the amount of Six Hundred Eighty Four Thousand Five Hundred Seventy Three and 39/100 Dollars ($684,573.39) and accrued and unpaid interest in the amount of Six Thousand Eight Hundred Seventy Three and 10/100 Dollars ($6,873.10), and late charges fees in the amount of Four Thousand Forty Five and 79/100 Dollars ($4,045.79) (the "Unpaid Late Charges").

Obligors acknowledge and represent that the Debt, is true and correct, remains outstanding and unpaid, is due and payable in full without offset, deduction or counterclaim of any kind, and is subject to increase or adjustment as a result of any interest, fees and other charges or advances of any kind, including, without limitation, attorneys' fees and costs of collection pursuant to the Loan Documents.

3.2     **Recitals**.  The recitals set forth above are true, complete, accurate, and correct and are part of this Agreement, and such recitals are incorporated herein by this reference.

3.3     **No Claims or Defenses**.  Borrower has no claims, offsets, counterclaims, or defenses with respect to:  i) the payment of the Loan; ii) the payment of any other sums due under the Loan Documents; iii) the performance of Borrower's obligations under the Loan Documents; or iv) any liability of Borrower under any of the Loan Documents.

3.4     **No Breach by Bank**.  The Bank (including all of its predecessors): i)   has not breached any duty to Borrower in connection with the Loan; and ii) has fully performed all obligations it may have had or now has to Borrower.

3.5.     **No Novation**.  This Agreement is not intended by the parties to be a novation of the Loan Documents and, except as expressly modified herein, all terms, conditions, rights, and obligations as set out in the Loan Documents are hereby reaffirmed and shall otherwise remain in full force and effect as originally written and agreed.

3.6     **No Pending Bankruptcies**.  No action or proceeding, including, without limitation, a voluntary or involuntary petition for bankruptcy under any chapter of the Bankruptcy Code has been instituted by or against Borrower.

3.7     **Due Authorization**.  The individuals signing this Agreement on behalf of Borrower are duly authorized by Borrower to enter into this Agreement.

## SECTION 4.  COVENANTS AND CONDITIONS

In consideration of Bank's promise to forbear herein contained, Borrower hereby covenants and agrees with Bank:

4.1     **TEMPORARY AMENDMENTS TO FINAL DISBURSEMENT DURING THE FORBEARANCE PERIOD.**    During the term of the Forbearance, the Final Disbursement is hereby temporarily amended as hereinafter set forth. The Recitals are incorporated herein as though fully set forth herein.

1.1 **Monthly Payments.** The section entitled "Monthly Payments" shall be supplemented with the following:

" Notwithstanding the monthly payments set forth herein, on October 20, 2014, Borrower shall pay Lender monthly payments of principal and interest each in the amount of Three Thousand Three Hundred Eight One and 39/100 Dollars ($3,381.39)."

All other terms, conditions and covenants contained in the Loan Documents shall be and remain in full force and effect.

## SECTION 5.  ADDITIONAL CONDITIONS AND AGREEMENTS

5.1    Conditions Precedent.

5.1.1    This Agreement shall have been executed by Borrower and Bank;

5.1.2    All actions required to be taken by Borrower or any Guarantor or pledgor of collateral in connection with the transactions contemplated by this Agreement shall have been taken in form and substance satisfactory to Bank;

5.1.3    Bank shall have received counterpart originals of this Agreement executed by all parties listed on the signature page(s) hereto and originals or certified or other copies of such other documents as Bank may reasonably request;

5.1.4    Borrower shall be in compliance with all other terms of the Loan Documents other than as specifically provided herein;

5.1.5    The Bank shall have received evidence, satisfactory to the Bank, that the Borrower [and/or the Guarantor] has satisfied the insurance requirements set forth in the Loan Documents and that the Obligors have paid when due all taxes, assessments and governmental charges or levies imposed upon them, as applicable.

5.2    Conditions Subsequent.

5.2.1    Late Charges.  As of the date hereof, Unpaid Late Charges in the amount of Four Thousand Forty Five and 79/100 Dollars ($4,045.79) are due and payable to Bank. Bank has agreed to waive the collection of these late charges upon the Effective Date.

5.2.2    Borrow shall provide to Bank updated financial statements and 2013 Personal Tax Return by October 15, 2014.

## SECTION 6.  MISCELLANEOUS

6.1    **Confirmation of  Collateral/Further Assurances.**.  Borrower hereby: i) confirms to Bank all security interests and liens heretofore granted by it to Bank securing the obligations of Borrower to Bank arising out of the Loan Documents;  ii) acknowledges and agrees that all such obligations shall continue to be secured by any and all such security interests and liens except as expressly provided herein; and  iii) agrees to execute and deliver to Bank any and all agreements and other documentation and to take any and all actions reasonably requested by Bank at any time to assure

the perfection, protection, priority, and enforcement of Bank's rights under the Loan Documents, including this Agreement, with respect to all such security interests and liens, at Borrower's sole cost and expense.

6.2    **Binding Effect**.    This Agreement shall be binding upon Borrower, Bank, and their respective successors and assigns, and shall inure to the benefit of Borrower, Bank, and their respective successors and assigns; provided, however, that Borrower may not assign any rights arising from this Agreement or any Loan Documents without Bank's prior written consent, and any prohibited assignment shall be null and void.

6.3    **Counterparts; Effectiveness.**    This Agreement may be executed in any number of counterparts and by the different parties on separate counterparts.  Each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same agreement. This Agreement shall be deemed to have been executed and delivered on the Effective Date. Facsimile copies, including those delivered by email of a pdf copy may be relied on as originals.

6.4    **Amendment and Waiver**.    No amendment or waiver of any provision of this Agreement shall be effective unless set forth in a writing signed by the parties hereto.

6.5    **Governing Law**.    This Agreement shall be governed by and construed in accordance with the internal laws of the state provided for in the Loan Documents without reference to conflict of law principles.

6.6    **Severability**.    Any provision of this Agreement that is held to be inoperative, unenforceable, voidable, or invalid in any jurisdiction shall, as to that jurisdiction, be ineffective, unenforceable, void, or invalid without affecting the remaining provisions in that or any other jurisdiction, and to this end the provisions of this Agreement are declared to be severable.

6.7    **Release**.    As a material part of the consideration for Bank entering into this Agreement, Borrower and, if any, each guarantor or owner of collateral signing this Agreement (collectively "Releasor") agree as follows (the "Release Provision"):

6.7.1.    Releasor hereby releases and forever discharges the Bank and the  Bank's predecessors, successors, assigns, officers, managers, directors, shareholders, employees, agents, attorneys, representatives, parent corporations, subsidiaries, and affiliates (hereinafter all of the above collectively referred to as the "Bank Group") jointly and severally from any and all claims, counterclaims, demands, damages, debts, agreements, covenants, suits, contracts, obligations, liabilities, accounts, offsets, rights, actions, and causes of action of any nature whatsoever, including, without limitation, all claims, demands, and causes of action for contribution and indemnity, whether arising at law or in equity, whether presently possessed or possessed in the future, whether known or unknown, whether liability be direct or indirect, liquidated or unliquidated, whether presently accrued or to accrue hereafter, whether absolute or contingent, foreseen or unforeseen, and whether or not heretofore asserted, which Releasor may have or claim to have against any of the Bank Group; provided, however, that the Bank shall not be released hereby from any obligation to pay to Releasor any amounts that Releasor may have on deposit with the Bank, in accordance with applicable law and the terms of the documents establishing any such deposit relationship;

6.7.2.    Releasor agrees not to sue any of the Bank Group or in any way assist any other person or entity in suing the Bank Group with respect to any claim released herein. The Release

Provision may be pleaded as a full and complete defense to, and may be used as the basis for an injunction against, any action, suit, or other proceeding which may be instituted, prosecuted, or attempted in breach of the release contained herein;

      6.7.3   Releasor acknowledges, warrants, and represents to the Bank Group that:

      6.7.3.1.   Releasor has read and understands the effect of the Release Provision. Releasor has had the assistance of independent counsel of its own choice, or has had the opportunity to retain such independent counsel, in reviewing, discussing, and considering all the terms of the Release Provision; and if counsel was retained, counsel for Releasor has read and considered the Release Provision and advised Releasor to execute the same.  Before execution of this Agreement, Releasor has had adequate opportunity to make whatever investigation or inquiry it may deem necessary or desirable in connection with the subject matter of the Release Provision.

      6.7.3.2.   Releasor is not acting in reliance on any representation, understanding, or agreement not expressly set forth herein. Releasor acknowledges that the Bank Group has not made any representation with respect to the Release Provision except as expressly set forth herein.

      6.7.3.3.   Releasor has executed this Agreement and the Release Provision thereof as its free and voluntary act, without any duress, coercion, or undue influence exerted by or on behalf of any person.

      6.7.3.4.   Releasor is the sole owner of the claims released by the Release Provision, and Releasor has not heretofore conveyed or assigned any interest in any such claims to any other person or entity.

      6.7.4.   Releasor understands that the Release Provision was a material consideration in the agreement of the Bank to enter into this Agreement;

      6.7.5.   It is the express intent of Releasor that the release and discharge set forth in the Release Provision be construed as broadly as possible in favor of the Bank Group so as to foreclose forever the assertion by Releasor of any claims released hereby against the Bank Group;

      6.7.6   If any term, provision, covenant, or condition of the Release Provision is held by a court of competent jurisdiction to be invalid, illegal, or unenforceable, the remainder of the provisions shall remain in full force and effect.

   7. **FINAL AGREEMENT.  THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES HERETO, and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements between the parties.  There are no unwritten oral agreements between the parties.**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

BORROWER:

**A WORLD OF SMILES LLC**


By: _____
       Brigette N. Jones, Member


By: _____
       Norman L. McGeathy III, Member


LENDER:

**BANK OF AMERICA, N.A.**


By: _____
       Austin Carey
       Vice President


Each of the undersigned guarantors/owners of collateral:  i) consents to and joins in the above Agreement (including, without limitation, any Release provision); ii) warrants and covenants to Bank that, except to the extent previously disclosed to Bank in writing, all representations and warranties previously made by it to Bank are true, complete, and accurate as of the date of this Agreement; and iii) confirms to Bank all security interests and liens heretofore granted by it to Bank.

Although each undersigned guarantor and/or owner of collateral ("Guarantor") has been informed of the matters set forth herein and has acknowledged and agreed to same, such Guarantor understands that Bank has no obligation to inform any Guarantor of such matters in the future or to seek any Guarantor's acknowledgment or agreement to future consents, waivers or amendments, and nothing herein shall create such a duty.


By: _____
       Brigette N. Jones, Individually


By: _____
       Norman L. McGeathy III, Individually

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

BORROWER:

**A WORLD OF SMILES LLC**

By: _____
       Brigette N. Jones, Member

By: _____
       Norman L. McGeathy III, Member

LENDER:

**BANK OF AMERICA, N.A.**

By: _____
       Austin Carey
       Vice President

Each of the undersigned guarantors/owners of collateral:  i) consents to and joins in the above Agreement (including, without limitation, any Release provision); ii) warrants and covenants to Bank that, except to the extent previously disclosed to Bank in writing, all representations and warranties previously made by it to Bank are true, complete, and accurate as of the date of this Agreement; and iii) confirms to Bank all security interests and liens heretofore granted by it to Bank.

Although each undersigned guarantor and/or owner of collateral ("Guarantor") has been informed of the matters set forth herein and has acknowledged and agreed to same, such Guarantor understands that Bank has no obligation to inform any Guarantor of such matters in the future or to seek any Guarantor's acknowledgment or agreement to future consents, waivers or amendments, and nothing herein shall create such a duty.

By: _____
       Brigette N. Jones, Individually

By: _____
       Norman L. McGeathy III, Individually

# EXHIBIT
# G

**Bank of America** ≫≫≫

## AMENDMENT TO LOAN DOCUMENTS

This Amendment to Loan Documents (this "Amendment" or "Agreement") is dated December 17, 2014 (the "Effective Date") by and among **BANK OF AMERICA, N.A.** ("Bank" or "Lender"), **A WORLD OF SMILES LLC** ("Borrower") **BRIGETTE N. JONES** and **NORMAN L. MCGREATHY III** (if more than one, individually referred to as "each Guarantor" and collectively referred to as "Guarantor").and will serve to confirm certain agreements with respect to the following:

## RECITALS

**A**  That certain Forbearance Agreement executed by Borrower on or about October 10, 2014 (the "Forbearance Agreement") and entered into for Borrower's failure to pay the monthly obligation due to Bank for the monthly periods of February 2014 through and including August 2014.

**B**  That certain Final Disbursement, Change and Repayment Schedule executed by Borrower on or about September 6, 2012 (the Final Disbursement") in the amount of Six Hundred Forty Three Thousand Four Hundred Sixty One and 59/100 Dollars ($643,461.59) (the "Loan")

**C**  That certain Project Finance Agreement executed by Borrower on or about March 28, 2011 (the "Finance Agreement")

**D**  As used herein, the term "Loan Documents" shall mean the Forbearance Agreement, Final Disbursement, Finance Agreement, and all other documents executed and delivered to Lender which evidence, secure, guaranty or relate to the Loan (as heretofore modified or amended).  Lender remains the owner and holder of the Loan Documents

**E**  As of December 17, 2014 the amount due under the Loan Documents is Six Hundred Ninety Nine Thousand Two Hundred Twenty Seven and 35/100 Dollars (**$699,227.35**) (the "Total Indebtedness") consisting of principal in the amount of Six Hundred Eighty Four Thousand Five Hundred Seventy Three and 39/100 Dollars (**$684,573.39**) and accrued and unpaid interest in the amount of Fourteen Thousand Six Hundred Fifty Three and 96/100 Dollars (**$14,653.96**).

**F**  Borrower has requested that Bank continue to forbear from enforcing its rights under the Loan Documents and extend the terms of the Forbearance Agreement.

**G**  Pursuant to Borrower's request, although under no obligation to do so, Bank is willing to forbear from exercising its rights and remedies under the Loan Documents for a period of time as specified herein and extend the terms of the Forbearance Agreement, subject to the terms and conditions set forth herein.

For purposes of this Agreement, Borrower and Guarantor are sometimes collectively referred to as the "Obligors."

Capitalized terms used herein and not otherwise defined shall have the meaning set forth in the Loan Documents.

## AGREEMENT

Now, therefore, in consideration of the premises and the mutual agreements contained herein, the parties agree to amend the Loan Documents as follows:

1.    **AMENDMENT TO FORBEARANCE AGREEMENT.** The Forbearance Agreement is hereby amended as hereinafter set forth.

1.1    **Forbearance Termination Date.** The defined term "Forbearance Termination Date" as set forth in section 1.1 entitled "Definitions" shall be amended and extended to February 28, 2015.

2.    **AMENDMENT TO FINAL DISBURSEMENT.** The Final Disbursement is hereby amended as hereinafter set forth.

2.1    **Monthly Payment(s).** The section of the Final Disbursement entitled "Monthly Payment(s)" shall be supplemented as follows:

"Notwithstanding the monthly payments set forth herein, on December 28, 2014 and January 28, 2015, Borrower shall pay Bank on each such date, combined payments of principal and interest in the amount of Five Thousand Six Hundred Twenty Seven and 14/100 Dollars ($5,627.14).

On February 28, 2015 (the "Maturity Date") Borrower shall make one (1) final payment in an amount equal to the then remaining outstanding Total Indebtedness due to Bank.

Each monthly payment shall first be applied to accrued and unpaid interest and the balance to principal unless indicated otherwise by Bank in writing."

All other terms, conditions and covenants contained in the Loan Documents shall be and remain in full force and effect.

3.    **OTHER AGREEMENTS.** Upon reviewing the Loan Documents, specifically the Forbearance Agreement, two (2) scrivener errors have been noted as follows:

- The date of the Disbursement Agreement within the Forbearance Agreement recitals (noted as recital B) was incorrectly noted as "September 7, 2012" whereas the date should read "September 6, 2012" and

- The Loan dollar amount within the Forbearance Agreement recitals (noted as recital B) was incorrectly noted as "$643,4461.59" whereas the Loan dollar amount should read "$643,461.59."

4.    **REPRESENTATIONS AND WARRANTIES**.  In order to induce Bank to enter into this Amendment, Borrower hereby represents and warrants to Bank that except as has been previously disclosed in writing by Borrower to Bank:  i) all of the representations and warranties set forth in the Loan Documents are true and correct on and as of the date of this Amendment and are applicable to this Amendment; ii) no default has occurred under the Loan Documents; iii) no event, which, with the giving of notice or lapse of time or both, would cause a default under the Loan Documents has occurred and is continuing; and iv) since the Origination Date there has been no material adverse change in the financial condition or business operations of the Borrower.  Further, Borrower hereby represents and warrants to Bank that the individuals signing this Amendment on behalf of Borrower are duly authorized by Borrower to enter into this Amendment.

5.    **Conditions Precedent.**  This Amendment shall become effective (the "Effective Date") when:

    5.1    This Amendment has been executed by Borrower and Bank.

    5.2    All actions required to be taken by Borrower in connection with the transactions contemplated by this Amendment have been taken in form and substance satisfactory to Bank.

    5.3    Bank has received counterpart originals of this Amendment executed by all parties listed on the signature page(s) hereto and originals or certified or other copies of such other documents as Bank may reasonably request.

    5.4    Borrower shall be in compliance with all other terms and conditions of the Loan Documents other than as specifically provided herein.

    5.5    Borrower and/or guarantor shall have provided to Bank evidence that it has satisfied and is in compliance with all insurance requirements contained in the Loan Documents, as applicable.

    5.6    **Past Due Payment.**  Borrower shall, contemporaneously with the execution of this Agreement, remit the past due November 2014 monthly obligation due to the Bank in the amount of Five Thousand Six Hundred Twenty Seven and 14/100 Dollars ($5,627.14) (the "Past Due Payment").  The Past Due Payment shall first be applied to accrued and unpaid interest and the balance to principal. After the application of the verified good funds, Bank agrees to waive the November 2014 late charge.

6.    **REAFFIRMATION.**  Except as modified hereby, all of the terms, covenants, and conditions of the Loan Documents are ratified, reaffirmed, and confirmed and shall continue in full force and effect. Should any term or provision of the Loan Documents conflict with the terms or provisions contained in this Amendment the terms and provisions of this Amendment shall be

3

controlling.  This Amendment is not intended to be, nor shall it be construed to be, a novation or an accord and satisfaction of any other obligation or liability of Borrower to Bank.

7.     **BINDING EFFECT.**  This Amendment shall be binding upon Borrower, Bank, and their respective successors and assigns, and shall inure to the benefit of Borrower, Bank, and their respective successors and assigns; provided, however, that Borrower may not assign this Amendment, the Loan Documents, or its rights arising out of any agreements or instruments relating thereto without Bank's prior written consent, and any prohibited assignment shall be null and void. The Bank may, without notice to or consent of any person, sell, assign, securitize, grant a participation in or otherwise dispose of all or any portion of the Loan Documents.  In the event that Bank seeks to sell, assign, securitize or participate interests in all or any part of the Loan, then Borrower and, if any, all guarantors hereby authorize Bank to release all or part of any financial or credit information provided by any of them to Bank to any such Banks, insurance companies, pension funds, trusts or other institutional Banks or entities, parties or investors without notice to Borrower or guarantors.

8.     **COUNTERPARTS; EFFECTIVENESS.**  This Amendment may be executed in any number of counterparts and by the different parties on separate counterparts.  Each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same agreement.  This Amendment shall be deemed to have been executed and delivered on the Effective Date.  Facsimile copies, including those delivered by email of a pdf copy may be relied on as originals.

9.     **AMENDMENT AND WAIVER.**  No amendment or waiver of any one or more of the provisions hereof shall be effective unless set forth in writing and signed by the parties hereto.

10.    **GOVERNING LAW.**  This Amendment shall be governed by and construed in accordance with the internal laws of the state provided for in the Loan Documents without reference to conflict of law principles.

11.    **SEVERABILITY.**  Any provision of this Amendment that is held to be inoperative, unenforceable, voidable, or invalid in any jurisdiction shall, as to that jurisdiction, be ineffective, unenforceable, void, or invalid without affecting the remaining provisions in that or any other jurisdiction, and to this end the provisions of this Amendment are declared to be severable.

12.    **RELEASE.**  As a material part of the consideration for Bank entering into this Amendment, Borrower and, if any, each guarantor or owner of collateral signing this Amendment, (collectively "Releasor") agree as follows (the "Release Provision"):

12.1     Releasor hereby releases and forever discharges Bank and Bank's predecessors, successors, assigns, officers, managers, directors, shareholders, employees, agents, attorneys, representatives, parent corporations, subsidiaries, and affiliates (hereinafter all of the above collectively referred to as "Bank Group"), jointly and severally from any and all claims,

4

counterclaims, demands, damages, debts, agreements, covenants, suits, contracts, obligations, liabilities, accounts, offsets, rights, actions and causes of action of any nature whatsoever, including, without limitation, all claims, demands, and causes of action for contribution and indemnity, whether arising at law or in equity, whether presently possessed or possessed in the future, whether known or unknown, whether liability be direct or indirect, liquidated or unliquidated, whether presently accrued or to accrue hereafter, whether absolute or contingent, foreseen or unforeseen, and whether or not heretofore asserted, which Releasor may have or claim to have against any of Bank Group; provided, however, that Bank shall not be released hereby from any obligation to pay to Releasor any amounts that Releasor may have on deposit with Bank, in accordance with applicable law and the terms of the documents establishing any such deposit relationship.

12.2   Releasor agrees not to sue any of Bank Group or in any way assist any other person or entity in suing Bank Group with respect to any claim released herein. The Release Provision may be pleaded as a full and complete defense to, and may be used as the basis for an injunction against, any action, suit, or other proceeding which may be instituted, prosecuted, or attempted in breach of the release contained herein.

12.3   Releasor acknowledges, warrants, and represents to Bank Group that:

12.3.1   Releasor has read and understands the effect of the Release Provision. Releasor has had the assistance of independent counsel of its own choice, or has had the opportunity to retain such independent counsel, in reviewing, discussing, and considering all the terms of the Release Provision; and if counsel was retained, counsel for Releasor has read and considered the Release Provision and advised Releasor to execute the same. Before execution of this Amendment, Releasor has had adequate opportunity to make whatever investigation or inquiry it may deem necessary or desirable in connection with the subject matter of the Release Provision.

12.3.2   Releasor is not acting in reliance on any representation, understanding, or agreement not expressly set forth herein. Releasor acknowledges that Bank Group has not made any representation with respect to the Release Provision except as expressly set forth herein.

12.3.3   Releasor has executed this Amendment and the Release Provision thereof as its free and voluntary act, without any duress, coercion, or undue influence exerted by or on behalf of any person.

12.3.4   Releasor is the sole owner of the claims released by the Release Provision, and Releasor has not heretofore conveyed or assigned any interest in any such claims to any other person or entity.

12.4   Releasor understands that the Release Provision was a material consideration in the agreement of Bank to enter into this Amendment.

5

12.5  It is the express intent of Releasor that the release and discharge set forth in the Release Provision be construed as broadly as possible in favor of Bank so as to foreclose forever the assertion by Releasor of any claims released hereby against Bank.

12.6  If any term, provision, covenant, or condition of the Release Provision is held by a court of competent jurisdiction to be invalid, illegal, or unenforceable, the remainder of the provisions shall remain in full force and effect.

13.    **Document Receipt Cut-Off Date**.  Unless this Amendment and any documents required by this Amendment have been signed and returned to the Bank within five (5) days after the date of this Amendment (the "Document Receipt Cut-Off Date"), the Bank shall have the right to notify the Borrower in writing that the Bank's commitment to extend credit under this Amendment has expired.  If the executed Amendment and accompanying loan documents are received after the Document Receipt Cut-Off Date, the Bank shall have a reasonable period of time after receipt of the executed Amendment and accompanying loan documents to provide such notice.

14.    **FINAL AGREEMENT.**  BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT:  (A) THIS DOCUMENT REPRESENTS THE FINAL AGREEMENT BETWEEN PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS DOCUMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS DOCUMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.

15.    **WAIVER OF JURY TRIAL.**  EACH OBLIGOR KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT IT MAY HAVE OR HEREAFTER HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE UNDERLYING TRANSACTIONS.  EACH OBLIGOR CERTIFIES THAT NEITHER THE BANK NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE BANK WOULD NOT IN THE EVENT OF ANY SUCH SUIT, SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.  EACH OBLIGOR AGREES AND UNDERSTANDS THAT THE EFFECT OF THIS PROVISION IS THAT THE OBLIGOR GIVES UP THE RIGHT TO TRIAL BY JURY TO THE EXTENT PERMITTED BY LAW.

IN WITNESS WHEREOF, this Amendment is executed as of the date stated at the top of the first page.

LENDER:

BANK OF AMERICA, N.A.

By: _____

Printed Name: _Austin Ceck_

Title: _Vice President_

BORROWER:

A WORLD OF SMILES LLC

By: _Brigette Jones McGeathy_
BRIGETTE N. JONES, MEMBER

By: _Norman L. McGeathy III_
NORMAN L. MCGREATHY III, MEMBER

## CONSENT

Each of the undersigned guarantors/owners of collateral:  i) consents to and joins in the above Amendment (including without limitation any Release provision) and ii) warrants and covenants to Bank that, except to the extent previously disclosed to Bank in writing, all representations and warranties previously made by it to Bank are true, complete, and accurate as of the date of this Amendment.

Although each undersigned guarantor/owner of collateral ("Guarantor") has been informed of the matters set forth herein and has acknowledged and agreed to same, such Guarantor understands that Bank has no obligation to inform any Guarantor of such matters in the future or to seek any Guarantor's acknowledgment or agreement to future consents, waivers or amendments, and nothing herein shall create such a duty.

GUARANTOR:

By:  BRIGETTE N. JONES

_Brigette Jones McGeathy_ Individually

By: NORMAN L. MCGREATHY III

_Norman L. McGeathy III_ Individually

# EXHIBIT H

**Bank of America** 🇺🇸

## SECOND AMENDMENT TO FORBEARANCE AGREEMENT

This Second Amendment to Forbearance Agreement ("**Agreement**") is dated April 3, 2015 (the "**Effective Date**") by and among **BANK OF AMERICA, N.A.** ("Bank" or "Lender"), **A WORLD OF SMILES LLC F/K/A KIDS 2 ADULTS DENTAL LLC** ("Borrower"), **BRIGETTE N. JONES** and **NORMAN L. MCGREATHY III** (if more than one, individually referred to as "each Guarantor" and collectively referred to as "Guarantor").and will serve to confirm certain agreements with respect to the following:

## <u>RECITALS</u>

A   That certain Amendment to Loan Documents executed by Borrower on or about December 17, 2014, which expired on February 28, 2015 ("**First Amendment to Forbearance Agreement**")

B   That certain Forbearance Agreement executed by Borrower on or about October 10, 2014 (the "**Forbearance Agreement**") entered into for Borrower's failure to pay the monthly obligation due to Bank for the monthly periods of February 2014 through and including August 2014.

C   That certain Final Disbursement, Change and Repayment Schedule executed by Borrower on or about September 6, 2012 (the "**Final Disbursement**") in the amount of Six Hundred Forty Three Thousand Four Hundred Sixty One and 59/100 Dollars ($643,461.59) (the "**Loan**").

D   That certain Project Finance Agreement executed by **MCGREATHY JONES DDS, a GENERAL PARTNERSHIP N/K/A A WORLD OF SMILES LLC** and **F/K/A KIDS 2 ADULTS DENTAL LLC** on or about March 28, 2011 (the "**Finance Agreement**").

E   As used herein, the term "Loan Documents" shall mean the Finance Agreement, the Final Disbursement, and all documents executed and delivered to Lender which evidence, secure, guaranty or relate to the Loan (as heretofore modified or amended). Lender remains the owner and holder of the Loan Documents.

F   As of April 3, 2015 the amount due under the Loan Documents is Six Hundred Ninety Three Thousand One Hundred Twenty and 17/100 Dollars (**$693,120.17**) (the "**Debt**") consisting of principal in the amount of Six Hundred Eighty One Thousand Seven Hundred Seventeen and 59/100 Dollars (**$681,717.59**) and accrued and unpaid interest in the amount of Eleven Thousand Four Hundred Two and 58/100 Dollars (**$11,402.58**)

**G**   Borrower acknowledges and represents that the Debt listed above is true and correct, remains outstanding and unpaid, and is due and payable in full in accordance with the Loan Documents.

**H**   Borrower has requested that Bank continue to forbear from enforcing its rights under the Loan Documents and extend the terms of the Forbearance Agreement.

**I**   Pursuant to Borrower's request, although under no obligation to do so, Bank is willing to forbear from exercising its rights and remedies under the Loan Documents for a period of time as specified herein and extend the terms of the Forbearance Agreement, subject to the terms and conditions set forth herein.

## AGREEMENT

Now, therefore, in consideration of the premises and the mutual agreements contained herein, the parties agree as follows:

1.      **DEFINED TERMS.**   Unless otherwise defined in this Agreement, all capitalized terms used herein as defined terms shall have the meanings given to them in the Loan Documents and/or the Forbearance Agreement (as previously amended).

2.      **TERMS OF FORBEARANCE.**   Unless the Forbearance Period (as defined below) is sooner terminated as provided herein, Lender agrees to forbear from exercising its rights and remedies under the Loan Documents through the last Business Day of July 2015 (the "Forbearance Period") on the following terms and conditions (Unless specifically modified herein, all terms, conditions and covenants contained in the Loan Documents shall be and remain in full force and effect.):

For purposes hereof "Business Day" means a day other than Saturday, Sunday or other day on which commercial banks are authorized to close, or are in fact closed, in the state where the Bank's lending office is located.

2.1.      Upon the termination of the Forbearance Period for any reason, Lender shall have the full right and power immediately and unconditionally to exercise all rights and remedies granted to it under the Loan Documents without further notice to Borrower and subject to no other conditions precedent;

2.2.      Borrower acknowledges that Lender's obligations under this Agreement are in the nature of a conditional forbearance only, and that Lender has made no agreement or commitment to extend the Loan or to modify the Loan Documents;

2.3.      On the sooner to occur of (i) the last Business day of July 2015 or (ii) termination of the Forbearance Period in accordance with Section 4 of this Agreement, all remaining unpaid principal, accrued interest, fees, expenses and other amounts owing under the Loan Documents shall be due and payable in full.

2.4.   **Repayment Terms.**   In lieu of any other payment schedule and during the Forbearance Period, the payment terms are as follows:

.(a)   The Borrower will repay principal and interest in equal combined installments of Five Thousand Six Hundred Twenty-Seven and 14/100 Dollars (**$5,627.14**) beginning the last Business Day of April 2015, and on the same day of each month thereafter, and ending on the last Business Day of July 2015 (the "**Repayment Period**"). In any event, on the last day of the Repayment Period, the Borrower will repay the remaining principal balance plus any interest and other charges then due. Each installment, when paid, will be applied first to the payment of interest accrued. The amount of interest due, and the portion of each installment which is applied to interest, will change from time to time if there are changes in the applicable interest rate. The balance, if any, of each installment will be applied to the repayment of principal. If the accrued interest owing exceeds the amount of any installment, the Borrower will pay the excess in addition to the installment. The excess accrued interest will be paid on the due date of the installment.

(b)   The Borrower may prepay principal in full or in part at any time without the payment of a prepayment fee or premium. The prepayment will be applied to the most remote payment of principal due under this Agreement.

3.   **CONDITIONS.**   The Lender's forbearance obligations hereunder shall be subject to the satisfaction on or before the execution date of this Agreement, unless an alternate date is specified, of the following conditions precedent:

3.1.   This Agreement shall have been executed by Borrower and Lender;

3.2.   All actions required to be taken by Borrower or any Guarantor or pledgor of collateral in connection with the transactions contemplated by this Agreement shall have been taken in form and substance satisfactory to Lender;

3.3.   Lender shall have received counterpart originals of this Agreement executed by all parties listed on the signature page(s) hereto and originals or certified or other copies of such other documents as Lender may reasonably request;

3.4.   Borrower shall be in compliance with all other terms of the Loan Documents other than as specifically provided herein;

3.5.   Past Due Payment. Borrower shall, contemporaneously with the execution of this Agreement, remit the past due March 2015 monthly obligation due to the Bank in the amount of Five Thousand Six Hundred Twenty Seven and 14/100 Dollars (**$5,627.14**) (the "**Past Due Payment**"). The Past Due Payment shall first be applied to accrued and unpaid interest and the balance to principal.

3.6.   Personal Financial Statements. Borrower shall furnish or cause to furnish the most recent personal financial statements of each Guarantor.

3.7. <u>Evidence of Insurance</u>.   The Lender shall have received evidence, satisfactory to the Lender, that the Borrower and/or the Guarantor has satisfied the insurance requirements set forth in the Loan Documents and that the Obligors have paid when due all taxes, assessments and governmental charges or levies imposed upon them.

4.   **TERMINATION OF FORBEARANCE PERIOD.**   The Forbearance Period shall end on the date of the first of the following to occur (the "Forbearance Termination Date"):

4.1.     the last Business Day of July 2015

4.2.     A petition is filed by or against Borrower under Title 11 of the United States Code (the "Bankruptcy Code"); or Borrower makes any assignment for the benefit of creditors; or Borrower voluntarily or involuntarily becomes the subject of any other case or proceeding for the relief or protection of debtors under any other law or statute or under any provision of common law;

4.3.     Any default, other than the Identified Defaults, occurs or is determined to have occurred under any Loan Document, including this Agreement;

4.4.     Borrower initiates any judicial, administrative or arbitration proceeding against Lender;

4.5.     Borrower defaults on any obligation to any creditor other than Lender if Lender believes that such default materially adversely affects Borrower's ability to perform its obligations to Lender under the Loan Documents.

5.   **REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender that:

5.1.     <u>Recitals</u>.  The recitals set forth above are true, complete, accurate, and correct and are part of this Agreement, and such recitals are incorporated herein by this reference;

5.2.     <u>Loan Documents</u>.  Except to the extent previously disclosed to Lender in writing, all representations and warranties made and given by Borrower in the Loan Documents are true, complete, accurate, and correct, as if given on the effective date of this Agreement;

5.3.     <u>No Claims or Defenses</u>.  Borrower has no claims, offsets, counterclaims, or defenses with respect to:  i) the payment of the Loan; ii) the payment of any other sums due under the Loan Documents; iii) the performance of Borrower's obligations under the Loan Documents; or iv) any liability of Borrower under any of the Loan Documents;

5.4.     <u>No Breach by Lender</u>.  Lender (including all of its predecessors): i) has not breached any duty to Borrower in connection with the Loan; and ii) has fully performed all obligations it may have had or now has to Borrower;

5.5.     Interest and Other Charges.  All interest or other fees or charges which have been imposed, accrued or collected by Lender (including all of its predecessors) under the Loan Documents or in connection with the Loan through the date of this Agreement, and the method of computing the same, were and are proper and agreed to by Borrower, and were properly computed and collected;

5.6.     No Novation.  This Agreement is not intended by the parties to be a novation of the Loan Documents and, except as expressly modified herein, all terms, conditions, rights, and obligations as set out in the Loan Documents are hereby reaffirmed and shall otherwise remain in full force and effect as originally written and agreed;

5.7.     No Pending Bankruptcies.  No action or proceeding, including, without limitation, a voluntary or involuntary petition for bankruptcy under any chapter of the Bankruptcy Code, has been instituted by or against Borrower;

5.8.     Due Authorization.  The individuals signing this Agreement on behalf of Borrower are duly authorized by Borrower to enter into this Agreement.

6.     **CONFIRMATION OF COLLATERAL/FURTHER ASSURANCES.** Borrower hereby:  i) confirms to Lender all security interests and liens heretofore granted by it to Lender securing the obligations of Borrower to Lender arising out of the Loan Documents;  ii) acknowledges and agrees that all such obligations shall continue to be secured by any and all such security interests and liens except as expressly provided herein; and  iii) agrees to execute and deliver to Lender any and all agreements and other documentation and to take any and all actions reasonably requested by Lender at any time to assure the perfection, protection, priority, and enforcement of Lender's rights under the Loan Documents, including this Agreement, with respect to all such security interests and liens, at Borrower's sole cost and expense.

7.     **BINDING EFFECT.**  This Agreement shall be binding upon Borrower, Lender, and their respective successors and assigns, and shall inure to the benefit of Borrower, Lender, and their respective successors and assigns; provided, however, that Borrower may not assign any rights arising from this Agreement or any Loan Documents without Lender's prior written consent, and any prohibited assignment shall be null and void.

8.     **COUNTERPARTS; EFFECTIVENESS.**     This Agreement may be executed in any number of counterparts and by the different parties on separate counterparts.  Each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same agreement. This Agreement shall be deemed to have been executed and delivered on the Effective Date.

9.     **AMENDMENT AND WAIVER.**     No amendment or waiver of any provision of this Agreement shall be effective unless set forth in a writing signed by the parties hereto.

10.   **GOVERNING LAW.**   This Agreement shall be governed by and construed in accordance with the internal laws of the state provided for in the Loan Agreement without reference to conflict of law principles.

11.   **SEVERABILITY.**   Any provision of this Agreement that is held to be inoperative, unenforceable, voidable, or invalid in any jurisdiction shall, as to that jurisdiction, be ineffective, unenforceable, void, or invalid without affecting the remaining provisions in that or any other jurisdiction, and to this end the provisions of this Agreement are declared to be severable.

12.   **RELEASE.**   As a material part of the consideration for Lender entering into this Agreement, Borrower and, if any, each guarantor or owner of collateral signing this Agreement (collectively "Releasor") agree as follows (the "Release Provision"):

12.1.   Releasor hereby releases and forever discharges Lender and Lender's predecessors, successors, assigns, officers, managers, directors, shareholders, employees, agents, attorneys, representatives, parent corporations, subsidiaries, and affiliates (hereinafter all of the above collectively referred to as "Lender Group") jointly and severally from any and all claims, counterclaims, demands, damages, debts, agreements, covenants, suits, contracts, obligations, liabilities, accounts, offsets, rights, actions, and causes of action of any nature whatsoever, including, without limitation, all claims, demands, and causes of action for contribution and indemnity, whether arising at law or in equity, whether presently possessed or possessed in the future, whether known or unknown, whether liability be direct or indirect, liquidated or unliquidated, whether presently accrued or to accrue hereafter, whether absolute or contingent, foreseen or unforeseen, and whether or not heretofore asserted, which Releasor may have or claim to have against any of Lender Group; provided, however, that Lender shall not be released hereby from any obligation to pay to Releasor any amounts that Releasor may have on deposit with Lender, in accordance with applicable law and the terms of the documents establishing any such deposit relationship;

12.2.   Releasor agrees not to sue any of Lender Group or in any way assist any other person or entity in suing Lender Group with respect to any claim released herein. The Release Provision may be pleaded as a full and complete defense to, and may be used as the basis for an injunction against, any action, suit, or other proceeding which may be instituted, prosecuted, or attempted in breach of the release contained herein;

12.3.   Releasor acknowledges, warrants, and represents to Lender Group that:

12.3.1.   Releasor has read and understands the effect of the Release Provision. Releasor has had the assistance of independent counsel of its own choice, or has had the opportunity to retain such independent counsel, in reviewing, discussing, and considering all the terms of the Release Provision; and if counsel was retained, counsel for Releasor has read and considered the Release Provision and advised Releasor to execute the same. Before execution of this Agreement, Releasor has had

adequate opportunity to make whatever investigation or inquiry it may deem necessary or desirable in connection with the subject matter of the Release Provision.

       12.3.2.   Releasor is not acting in reliance on any representation, understanding, or agreement not expressly set forth herein. Releasor acknowledges that Lender Group has not made any representation with respect to the Release Provision except as expressly set forth herein.

       12.3.3.   Releasor has executed this Agreement and the Release Provision thereof as its free and voluntary act, without any duress, coercion, or undue influence exerted by or on behalf of any person.

       12.3.4.   Releasor is the sole owner of the claims released by the Release Provision, and Releasor has not heretofore conveyed or assigned any interest in any such claims to any other person or entity.

       12.4.   Releasor understands that the Release Provision was a material consideration in the agreement of Lender to enter into this Agreement;

       12.5.   It is the express intent of Releasor that the release and discharge set forth in the Release Provision be construed as broadly as possible in favor of Lender Group so as to foreclose forever the assertion by Releasor of any claims released hereby against Lender Group;

       12.6.   If any term, provision, covenant, or condition of the Release Provision is held by a court of competent jurisdiction to be invalid, illegal, or unenforceable, the remainder of the provisions shall remain in full force and effect.

    13.   **FINAL AGREEMENT.**   **THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES HERETO, and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements between the parties.  There are no unwritten oral agreements between the parties.**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

**BANK OF AMERICA, N.A.**

By: _____
      Austin Carey, Vice President

**A WORLD OF SMILES LLC**

By: _____
      Brigette N. Jones, Member

By: _____
      Norman L. McGeathy III, Member

### CONSENT

Each of the undersigned guarantors/owners of collateral: i) consents to and joins in the above Agreement (including without limitation any Reaffirmation or Release provisions); ii) warrants and covenants to Bank that, except to the extent previously disclosed to Bank in writing, all representations and warranties previously made by it to Bank are true, complete, and accurate as of the date of this Agreement; and iii) confirms to Bank all security interests and liens heretofore granted by it to Bank.

**GUARANTOR:**                                    **COLLATERAL OWNER:**

_____          _____
Brigette N. Jones, Individually                    Brigette N. Jones, Individually

_____
Norman L. McGeathy III, Individually

8

# EXHIBIT

# I

**Bank of America**

## LOAN MODIFICATION AGREEMENT

This Loan Modification Agreement dated as of August 31, 2015 (this "Amendment" or "Agreement"), is entered into by and between A World of Smiles LLC ("Borrower"), and BANK OF AMERICA, N.A., ("Bank" or "Lender").

### RECITALS

A.     On or about March 28, 2011, (the "Origination Date"), Borrower f/k/a Kids 2 Adults Dental LLC executed a certain Project Finance Agreement ("Finance Agreement") in favor or Bank pursuant to which Borrower was granted a loan or line of credit ("Loan") in the original principal amount of Six Hundred Thousand and 00/100 Dollars ($600,000.00) as modified and amended by a certain Final Disbursement, Change and Repayment Schedule ("Final Disbursement") dated on or about September 6, 2012 which increased the amount of the Loan to Six Hundred Forty-Three Thousand Four Hundred Sixty-One and 59/100 Dollars ($643,461.59). The Finance Agreement and the Final Disbursement is collectively referred to herein as ("Loan Documents"). As used herein, the term "Loan Documents" shall mean all documents executed and delivered to Bank which evidence, secure, guaranty or relate to the Loan (as heretofore modified or amended). Bank remains the owner and holder of the Loan Documents.

B.     As of August 31, 2015, the amount due under the Loan Documents is Seven Hundred Four Thousand Nine Hundred Twenty-Six and 36/100 Dollars ($704,926.36) consisting of principal in the amount of Six Hundred Seventy-Nine Thousand Two Hundred Two and 66/100 Dollars ($679,202.66), and accrued and unpaid interest in the amount of Twenty-Five Thousand Seven Hundred Twenty-Three and 70/100 Dollars ($25,723.70).

C.     Borrower and Bank wish to amend the Loan Documents as set forth in this Amendment. All capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Loan Documents.

### AGREEMENT

Now, therefore, in consideration of the premises and the mutual agreements contained herein, the parties agree as follows:

1.     **AMENDMENT TO LOAN DOCUMENTS.** The Loan Documents are amended as follows:

    1.1     **Maturity Date.** The maturity date of the Loan is changed from July 31, 2015 to February 28, 2016 ("Maturity Date"). On the Maturity Date, all unpaid principal, interest, fees and expenses shall be due and payable in full.

    1.2     **Interest Rate.** The interest rate is unchanged and remains as 8.25% per year.

    1.3     **Repayment Terms.** Effective August 31, 2015, the payment terms are changed as follows:

    (a)     The Borrower will repay principal and interest in equal combined installments of Five Thousand Six Hundred Twenty-Seven and 14/100 Dollars ($5,627.14) beginning on September 30, 2015, and on the last day of each month thereafter, and ending on February 28, 2016 ("Repayment Period"). In any event, on the last day of the Repayment Period, the Borrower will repay the remaining principal balance plus any interest and other charges then due. Each installment, when paid, will be applied first to the payment

of interest accrued.  The amount of interest due, and the portion of each installment which is applied to interest, will change from time to time if there are changes in the applicable interest rate.  The balance, if any, of each installment will be applied to the repayment of principal.  If the accrued interest owing exceeds the amount of any installment, the Borrower will pay the excess in addition to the installment.  The excess accrued interest will be paid on the due date of the installment.

(b)    The Borrower may prepay principal in full or in part at any time without the payment of a prepayment fee or premium.  The prepayment will be applied to the most remote payment of principal due under this Amendment.

1.4    **Deferral of Interest.**  Accrued and unpaid interest as of August 31, 2015 in the amount of Eleven Thousand Four Hundred Two and 58/100 Dollars ($11,402.58) will be deferred until February 28, 2016.

1.5    **Monthly Production Reports.**    Borrower shall provide Bank with monthly production reports in form and content acceptable to the Bank within fifteen (15) days of month-end showing a minimum of Fifteen Thousand and 00/100 Dollars ($15,000.00) in production.

All other terms, conditions and covenants contained in the Loan Documents shall be and remain in full force and effect.

2.    **REPRESENTATIONS AND WARRANTIES.**  In order to induce Bank to enter into this Amendment, Borrower hereby represents and warrants to Bank that except as has been previously disclosed in writing by Borrower to Bank:  i) all of the representations and warranties set forth in the Loan Documents are true and correct on and as of the date of this Amendment and are applicable to this Amendment; ii) no default has occurred under the Loan Documents; iii) no event, which, with the giving of notice or lapse of time or both, would cause a default under the Loan Documents has occurred and is continuing; and iv) since the Origination Date there has been no material adverse change in the financial condition or business operations of the Borrower except as may have been previously disclosed by Borrower to Bank in writing.   Further, Borrower hereby represents and warrants to Bank that the individuals signing this Amendment on behalf of Borrower are duly authorized by Borrower to enter into this Amendment.

3.    **CONDITIONS.**

3.1    Conditions Precedent.  This Amendment shall become effective when:

3.1.1    This Amendment has been executed by Borrower and Bank.

3.1.2    All actions required to be taken by Borrower in connection with the transactions contemplated by this Amendment have been taken in form and substance satisfactory to Bank.

3.1.3    Bank has received counterpart originals of this Amendment executed by all parties listed on the signature page(s) hereto and originals or certified or other copies of such other documents as Bank may reasonably request.

3.1.4    Borrower shall be in compliance with all other terms and conditions of the Loan Documents other than as specifically provided herein.

3.1.5    To the extent permitted by law, Bank shall have received reimbursement, in immediately available funds, of all costs and expenses incurred by Bank in connection with this Amendment as set forth in the Disbursement and Fee Statement dated August 31, 2015, including, as applicable, charges for title insurance (including endorsements), recording, filing and escrow charges, fees for appraisal, architectural and engineering review, construction services and environmental services, mortgage taxes, and legal fees and expenses of Bank's counsel, including the market value of

services of in-house counsel. Such costs and expenses may include the allocated costs for services of Bank's in-house appraisal and/or environmental services staffs. Borrower acknowledges that the modification fee payable in connection with this transaction does not include the amounts payable by Borrower under this subsection.

      3.1.6   Unless otherwise addressed herein, Borrower shall have paid to Bank any monthly payment unpaid on the Loan Documents, if any, through but not including the date of the execution and delivery of this Amendment.

      3.1.7   Borrower and/or guarantor shall have provided to Bank evidence that it has satisfied and is in compliance with all insurance requirements contained in the Loan Documents.

      3.1.8   Borrower shall have paid Bank a modification fee in the amount of Five Hundred and 00/100 Dollars ($500.00).

      3.1.9   Borrower shall have paid Bank combined principal and interest payment due as of June 30, 2015 in the amount of Five Thousand Six Hundred Twenty-Seven and 14/100 Dollars ($5,627.14).

      3.1.10  Borrower shall have paid Bank combined principal and interest payment due as of July 31, 2015 in the amount of Five Thousand Six Hundred Twenty-Seven and 14/100 Dollars ($5,627.14).

      3.1.11  Borrower shall have paid Bank combined principal and interest payment due as of August 31, 2015 in the amount of Five Thousand Six Hundred Twenty-Seven and 14/100 Dollars ($5,627.14).

      3.1.12  Borrower shall provide Bank with personal financial statements in form and content acceptable to the Bank.

    4.    **CONFIRMATION OF COLLATERAL/FURTHER ASSURANCES.** To the extent that Borrower has previously granted a security interest and/or lien to secure its obligations to Bank arising out of the Loan Documents, Borrower hereby: i) confirms to Bank all such security interests and liens ; ii) acknowledges and agrees that all such obligations shall continue to be secured by any and all such security interests and liens except as expressly provided herein; and iii) at Borrower's sole cost and expense, agrees to execute and deliver to Bank any and all agreements and other documentation and to take any and all actions reasonably requested by Bank at any time to assure the perfection, protection, and enforcement of Bank's rights under the Loan Documents as amended hereby with respect to all such security interests and liens.

    5.    **REAFFIRMATION.** Except as modified hereby, all of the terms, covenants, and conditions of the Loan Documents, including, but not limited to, the dispute resolution and/or jury trial waiver provision, if any, are ratified, reaffirmed, and confirmed and shall continue in full force and effect. Should any term or provision of the Loan Documents conflict with the terms or provisions contained in this Amendment the terms and provisions of this Amendment shall be controlling. This Amendment is not intended to be, nor shall it be construed to be, a novation or an accord and satisfaction of any other obligation or liability of Borrower to Bank.

    6.    **BINDING EFFECT.** This Amendment shall be binding upon Borrower, Bank, and their respective successors and assigns, and shall inure to the benefit of Borrower, Bank, and their respective successors and assigns; provided, however, that Borrower may not assign this Amendment, the Loan Documents, or its rights arising out of any agreements or instruments relating thereto without Bank's prior written consent, and any prohibited assignment shall be null and void. The Bank may, without notice to or consent of any person, sell, assign, securitize, grant a participation in or otherwise dispose of all or any portion of the Loan Documents. In the event that Bank seeks to sell, assign, securitize or participate interests in all or any part of the Loan, then Borrower and, if any, all guarantors hereby authorize Bank to release all or part of any financial or credit information provided by any of them to Bank to any such

banks, insurance companies, pension funds, trusts or other institutional lenders or entities, parties or investors without notice to Borrower or guarantors.

7.   **COUNTERPARTS; EFFECTIVENESS.**   This Amendment may be executed in any number of counterparts and by the different parties on separate counterparts.  Each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same agreement.  This Amendment shall be deemed to have been executed and delivered on the effective date.

8.   **AMENDMENT AND WAIVER.**   No amendment or waiver of any one or more of the provisions hereof shall be effective unless set forth in writing and signed by the parties hereto.

9.   **GOVERNING LAW.** This Amendment shall be governed by and construed in accordance with the internal laws of the state provided for in the Loan Documents without reference to conflict of law principles.

10.   **SEVERABILITY.**   Any provision of this Amendment that is held to be inoperative, unenforceable, voidable, or invalid in any jurisdiction shall, as to that jurisdiction, be ineffective, unenforceable, void, or invalid without affecting the remaining provisions in that or any other jurisdiction, and to this end the provisions of this Amendment are declared to be severable.

11.   **RELEASE.** As a material part of the consideration for Bank entering into this Amendment, Borrower and, if any, each guarantor or owner of collateral signing this Amendment, (collectively "Releasor") agree as follows ("Release Provision"):

11.1  Releasor hereby releases and forever discharges Bank and Bank's predecessors, successors, assigns, officers, managers, directors, shareholders, employees, agents, attorneys, representatives, parent corporations, subsidiaries, and affiliates (hereinafter all of the above collectively referred to as "Bank Group"), jointly and severally from any and all claims, counterclaims, demands, damages, debts, agreements, covenants, suits, contracts, obligations, liabilities, accounts, offsets, rights, actions and causes of action of any nature whatsoever, including, without limitation, all claims, demands, and causes of action for contribution and indemnity, whether arising at law or in equity, whether presently possessed or possessed in the future, whether known or unknown, whether liability be direct or indirect, liquidated or unliquidated, whether presently accrued or to accrue hereafter, whether absolute or contingent, foreseen or unforeseen, and whether or not heretofore asserted, which Releasor may have or claim to have against any of Bank Group; provided, however, that Bank shall not be released hereby from any obligation to pay to Releasor any amounts that Releasor may have on deposit with Bank, in accordance with applicable law and the terms of the documents establishing any such deposit relationship.

11.2  Releasor agrees not to sue any of Bank Group or in any way assist any other person or entity in suing Bank Group with respect to any claim released herein. The Release Provision may be pleaded as a full and complete defense to, and may be used as the basis for an injunction against, any action, suit, or other proceeding which may be instituted, prosecuted, or attempted in breach of the release contained herein.

11.3  Releasor acknowledges, warrants, and represents to Bank Group that:

11.3.1  Releasor has read and understands the effect of the Release Provision. Releasor has had the assistance of independent counsel of its own choice, or has had the opportunity to retain such independent counsel, in reviewing, discussing, and considering all the terms of the Release Provision; and if counsel was retained, counsel for Releasor has read and considered the Release Provision and advised Releasor to execute the same. Before execution of this Amendment, Releasor has had adequate opportunity to make whatever investigation or inquiry it may deem necessary or desirable in connection with the subject matter of the Release Provision.

11.3.2   Releasor is not acting in reliance on any representation, understanding, or agreement not expressly set forth herein. Releasor acknowledges that Bank Group has not made any representation with respect to the Release Provision except as expressly set forth herein.

11.3.3   Releasor has executed this Amendment and the Release Provision thereof as its free and voluntary act, without any duress, coercion, or undue influence exerted by or on behalf of any person.

11.3.4   Releasor is the sole owner of the claims released by the Release Provision, and Releasor has not heretofore conveyed or assigned any interest in any such claims to any other person or entity.

11.4   Releasor understands that the Release Provision was a material consideration in the agreement of Bank to enter into this Amendment.

11.5   It is the express intent of Releasor that the release and discharge set forth in the Release Provision be construed as broadly as possible in favor of Bank so as to foreclose forever the assertion by Releasor of any claims released hereby against Bank.

11.6   If any term, provision, covenant, or condition of the Release Provision is held by a court of competent jurisdiction to be invalid, illegal, or unenforceable, the remainder of the provisions shall remain in full force and effect.

12.   **FINAL AGREEMENT.  BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT:  (A) THIS DOCUMENT REPRESENTS THE FINAL AGREEMENT BETWEEN PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS DOCUMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS DOCUMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.**

13.   **Acknowledgment/Waiver of Legal Counsel.**  Borrower and each Guarantor signing this Amendment represents and warrants that they have carefully read and understand the effect of this Amendment, they have had the assistance of separate counsel, or have knowingly and intentionally elected to waive counsel, in carefully reviewing, discussing and considering all terms of this Amendment, and they have voluntarily and without coercion or duress of any kind, entered into this Amendment and the documents executed in connection with this Amendment.

IN WITNESS WHEREOF, this Amendment is executed as of the date stated at the top of the first page.

BANK OF AMERICA, N.A.

By: _____
Austin Carey
Vice President

A WORLD OF SMILES LLC

By: _____
Brigette N. Jones, Member

By: _____
Norman L. McGeathy III, Member

## CONSENT

Each of the undersigned guarantors/owners of collateral:   i) consents to and joins in the above Amendment (including without limitation any Reaffirmation or Release provisions); ii) warrants and covenants to Bank that, except to the extent previously disclosed to Bank in writing, all representations and warranties previously made by it to Bank are true, complete, and accurate as of the date of this Amendment; and iii) confirms to Bank all security interests and liens heretofore granted by it to Bank.

**GUARANTOR:**                                       **COLLATERAL OWNER:**


_____                 _____
Brigette N. Jones, Individually                   Brigette N. Jones, Individually


_____
Norman L. McGeathy III, Individually

# EXHIBIT

# J

**M<sup>c</sup>GLINCHEY STAFFORD**

ATTORNEYS AT LAW

CALIFORNIA   FLORIDA   LOUISIANA   MISSISSIPPI   NEW YORK   OHIO   TEXAS

Gabriel A. Crowson
(504) 596-2839
Fax (504) 910-8465
gcrowson@mcglinchey.com

March 4, 2016

**VIA FEDERAL EXPRESS AND CERTIFIED MAIL**

Brigette N. Jones
Norman L. McGeathy, III
Members
A World of Smiles, LLC
5800 Wright Road
New Orleans, LA 70128

7012 2210 0000 8013 8689

Brigette N. Jones
5800 Wright Road
New Orleans, LA 70128

7012 2210 0000 8013 8672

Norman L. McGeathy III
5800 Wright Road
New Orleans, LA 70128

RE:   Project Finance Term Loan Agreement
Notice of Default and Opportunity to Cure

Dear Ms. Jones and Mr. McGeathy:

Our firm has been retained by Bank of America, N.A. ("**Bank of America**"). Reference is made to the Project Finance Term Loan Agreement dated March 28, 2011; the Mortgage dated May 4, 2011; the Change Notification and Acknowledgment dated July 26, 2011; the Change Notification and Acknowledgment dated April 3, 2012; and the Final Disbursement, Change and Repayment Schedule dated September 6, 2012 (the "**Original Loan Documents**"). The Original Loan Documents evidence a professional practice loan made by Bank of America to A World of Smiles, LLC as the Borrower with Brigette N. Jones and Norman L. McGeathy III as Guarantors.

Reference is further made to the following forbearances and amendments to the Original Loan Documents (the "**Amended Loan Documents**"):

    *    Forbearance Agreement dated October 10, 2014;

    *    Amendment to Loan Documents dated December 17, 2014;

    *    Second Amendment to Forbearance Agreement dated April 3, 2015; and

12th Floor, 601 Poydras Street • New Orleans, LA 70130 • (504) 586-1200 • Fax (504) 596-2800 • TDD (504) 596-2728 • www.mcglinchey.com

McGlinchey Stafford PLLC in Florida, Louisiana, Mississippi, New York, Ohio and Texas.
McGlinchey Stafford LLP in California.

A World of Smiles, LLC
March 4, 2016
Page 2

   *  Loan Modification Agreement dated August 31, 2015.

  In accordance with the Original Loan Documents and the Amended Loan Documents, you are hereby notified that you are in default under the Original Loan Documents and the Amended Loan Documents because you have failed to pay the principal balance and accrued interest by the maturity date of February 28, 2016 (the "**Default**"). As of March 4, 2016, the total amount due is $692,509.85 (the "**Payoff Amount**"), plus interest accruing daily at the rate of $154.16 per day. The Payoff Amount is broken down as follows:

| | |
|---|---|
| Unpaid Principal | $672,736.97 |
| Unpaid Interest | $16,396.60 |
| Late Fees | $3,376.28 |
| **Total** | **$692,509.85** |

  In order to cure the Default, you must pay the Payoff Amount to Bank of America within 30 days of the date of this letter, or by April 4, 2016 (the "**Cure Date**"). If you fail to pay the Past Due Amount on or before the Cure Date, Bank of America may exercise any of its rights and remedies under the Original Loan Documents and/or Amended Loan Documents. Bank of America may also exercise any other remedies and rights available to Bank of America, as set forth in the Agreement and as permitted under applicable law, including the commencement of foreclosure proceedings on the property subject to the Mortgage.

       Very truly yours,

       **McGlinchey Stafford, PLLC**

       Gabriel A. Crowson

GAC